[No. D058657. Fourth Dist., Div. One. May 14, 2012.]

JOY CASH, Plaintiff and Respondent, v.
IOLA WINN, Individually and as Trustee, etc., Defendant and Appellant.

## Counsel

The Hughes Law Firm, Peter M. Hughes; Park Fryar and Michelle Soyon Park for Defendant and Appellant.

Mitchell | Gilleon Law Firm, James C. Mitchell, Daniel M. Gilleon; Law Office of Frank S. Clowney III and Frank S. Clowney III for Plaintiff and Respondent.

## Opinion

**HALLER, Acting P. J.**—When a family hires an employee to care for an elderly person in his or her home, is the employee entitled to overtime pay? Under California law, the answer depends on the type of work performed by the caretaker. If the employee performs the work of a "personal attendant[]," defined to mean a "person employed . . . to supervise, feed, or dress" the client, the caretaker is exempt from overtime pay requirements. (Industrial Welfare Commission (IWC) wage order No. 15-2001, §§ 1(B), 2(J), codified at Cal. Code Regs., tit. 8, § 11150.)[1] However, if the caretaker performs a "significant amount of work" in addition to these tasks, the caretaker is not exempt from overtime pay requirements. (§ 11150, subd. 2(J).) Additionally with certain exceptions, if the caretaker is a registered nurse employed to engage in the practice of nursing in the home, the nurse is not exempt from overtime pay requirements. (§ 11150, subd. 1(A)(3)(f), (g).)

The issue here is whether there exists an *additional* exception to the personal attendant exemption rule applicable if a caretaker, who is not a licensed nurse, performs any form of health-care-related services for an elderly client. Based on a sentence originally contained in an interpretive bulletin issued by the Division of Labor Standards Enforcement (DLSE) in 1986, the court instructed the jury that the personal attendant exemption to the overtime requirements is inapplicable if a caregiver, who is not a licensed nurse, regularly performs *any* health care functions, even if those tasks are incidental to the caretaker's primary tasks and regardless of the amount of time spent on these functions. We conclude this instruction reflects an improper interpretation of Wage Order No. 15 and, based on the jury's findings in the special verdict form, constituted prejudicial error.

---

[1] For ease of reference, we shall cite to the relevant provisions of the California Code of Regulations in referring to IWC wage order No. 15-2001. All further references to section 11150 are to the California Code of Regulations, title 8, section 11150, and all references to Wage Order No. 15 are to IWC wage order No. 15-2001.

OVERVIEW

Plaintiff Joy Cash, who is not a licensed or trained nurse, cared for Iola Winn, who was in her 90's, in Winn's home. After she left the employment, Cash sued Winn for failure to pay her overtime wages. In defense, Winn claimed that no overtime pay was required because Cash was a "personal attendant" within the meaning of Wage Order No. 15. The primary issue at trial was whether Cash met the definition of a "personal attendant" and thus was exempt from overtime pay requirements.

The court instructed the jury that a personal attendant is a person employed to "supervise, feed or dress" an elderly person who needs care, and explained the meaning of " 'supervision' " as including assistance with various daily living tasks. The court also instructed the jury that the personal attendant exemption does not apply when (1) the employee performs significant *other* work duties, meaning "duties which constitute greater than 20% of the weekly work time" *or* (2) the employee's "duties require the regular administration of health care services *such as the taking [of] temperatures or pulse or respiratory rate . . . , regardless of the amount of time such duties take . . . .*" (Italics added.)

In a special verdict, the jury found Cash was employed to supervise, feed, or dress Winn and that Cash's other work duties did not constitute greater than 20 percent of her worktime. But the jury also found that Cash's work involved "the regular administration of health care services" under the definition given by the court. Based on these findings and the jury's finding as to the amount of overtime pay owed, the court entered judgment in Cash's favor for $123,205.80, consisting of $33,711.50 in overtime wages, $14,083.40 in prejudgment interest, $72,380.50 in statutory attorney fees, and $3,030.40 in costs. The court denied Winn's posttrial motions.

Winn appeals, contending (1) the court erred in instructing the jury that the personal attendant exemption did not apply if Cash regularly performed any "health care services," defined to include "taking temperatures or pulse or respiratory rate," regardless of the amount of time spent on these tasks and (2) the court erred in denying her motions for new trial and judgment notwithstanding the verdict (JNOV).

We conclude the court prejudicially erred in instructing the jury. We further determine that based on the jury's findings, the court erred in denying Winn's JNOV motion and Winn is entitled to judgment as a matter of law. We thus reverse and remand with instructions to enter judgment in Winn's favor.

## FACTUAL AND PROCEDURAL SUMMARY

In 2005, Cash was working as a caregiver for elderly clients. She had never attended nursing school and was not a licensed nurse or dietitian. Cash, however, had education, training, and experience in massage therapy and nutrition, and had previously operated a childcare facility.

In approximately October 2005, Winn's family members interviewed Cash for a position as Winn's caregiver. At the time, Winn was 94 years old and lived alone in a small cottage of about 800 or 900 square feet. Cash knew the Winn family because she had rented property from the Winns in the 1970's. During the interview, the Winn family members told Cash they were looking for someone to be Winn's "companion and check on her and let them know how she was doing, and prepare nutritious meals that would be good for her diabetes." The family members told Cash that Winn was recently hospitalized for a diabetic episode. They also told Cash that the doctors had instructed that Winn have "plenty of protein and fruits and vegetables," but no "sweets" or "sugars." The doctors did not prescribe insulin injections, and instead told the family that Winn's diabetes should be controlled with a proper diet.

Shortly after, the Winn family hired Cash and they agreed on a $10 per hour wage. After about one month, Cash began staying with Winn approximately 18 hours per day, including sleeping in the house. She would usually arrive at Winn's residence about 11:30 a.m. and leave the next morning about 6:00 a.m. A second caretaker worked from 6:00 a.m. until 11:30 a.m. In addition, various Winn family members came to Winn's home in the evenings and on weekend days.

When Cash would first arrive at the house before noon, she would ask the other caregiver about Winn's blood-sugar level and would begin planning a noon meal based on that level. She would then cook the meal and eat lunch with Winn. She obtained information from the Internet about diabetes guidelines and attempted to follow them.

According to Cash, her primary tasks during her employment with Winn were helping Winn with grooming, dressing, preparing meals, grocery shopping, picking up medication, helping Winn get ready for bed, and reminding Winn to take her medications. During the afternoons, Cash "was always interacting" with Winn because Winn "was afraid to be left alone." Cash also testified that she would spend substantial time each day performing numerous household maintenance and cleaning tasks, including cleaning the kitchen, doing the laundry, cleaning the bathroom, taking out the trash, arranging and supervising worker appointments, and buying "household supplies."

With respect to Winn's medications, Cash testified that Winn took medications twice a day. Winn's medications were kept in a basket with instructions

as to when each should be taken. Cash would bring the basket to Winn and generally Winn would take the medications on her own. Cash said she would "go in the kitchen and read the labelings, get the appropriate amounts out for [Winn], bring them to her with water and apple sauce, and cut [some of the pills] and give [the medication] to her."

When Cash's counsel asked her what she would do on a "daily basis" relating to providing "healthcare" services to Winn, Cash identified several categories of tasks.

First, Cash said she would "massage" Winn's back, feet and legs. She said she performed these tasks "[m]ainly for soothing" purposes to help "settle" down Winn for the night, but she also gave the massages because they were good for "general circulation," and "to make sure there was blood flow in the legs."

Second, Cash said she would check Winn's "vital signs" by feeling Winn's pulse while she was having a "panic attack." Cash said that Winn would have a panic attack about five times a week, and that Cash would check Winn's pulse about four times a week. Cash said she would not write down the pulse rate or communicate the rate to a doctor or the family, but said she would check the rate to "evaluat[e]" Cash's panic attack. Specifically, Cash stated she would take Winn's pulse rate "[j]ust to see if [the panic attack] was a real—you know, if she was really stressed with the panic attack or not."

Third, Cash said she would "measure" Winn's oxygen by observing "blueness in [her] finger." She said she would do this about four or five times per week. Cash would also observe Winn's skin tone and eyes because "you can tell a lot by . . . what we call in Chinese medicine, [the] shin of the eyes."

Fourth, Cash said she would test Winn's blood sugar about once or twice a day. She would perform this test using Winn's over-the-counter blood-sugar test kit. When asked how much time she would spend on this task, Cash responded: "15 to 45 minutes, depends on if I did it three times or two times."

Cash also said she would drive Winn to the doctor's office about two to three times per month.

### Defense Case

In defense, Winn presented evidence showing that Cash was not hired to, and did not, clean the house, and instead she spent most of her time helping Winn with daily tasks and sitting next to Winn and conversing with her. This

evidence included facts showing that the other caregiver, Holly Johnson, was responsible for house cleaning and would clean the small cottage every other day. According to Johnson's testimony, Cash's only cleaning-related task was doing Winn's laundry. Additionally, Johnson (who was a certified medical assistant) testified that she would perform the blood-sugar test on Winn every morning.

Winn also presented evidence that her daughters, granddaughter, and son-in-law would perform major cleaning tasks and take out the trash during the weekends. Winn's adult granddaughter testified that she would perform a blood-sugar test on Winn in the evenings, and that Cash rarely performed this test (if at all).

*Jury Instructions*

At trial, both parties agreed that a personal attendant as defined in California law is exempt from overtime wages. (See § 11150, subds. 1(B), 2(J).) However, they disputed the meaning of a personal attendant. Before and after the presentation of evidence, the court and counsel devoted substantial time to crafting a jury instruction to define who is a personal attendant under California law.

At the conclusion of these discussions, the parties agreed that a personal attendant is someone who is employed to "supervise, feed, or dress a . . . person who by reason of advanced age, physical disability, or mental deficiency needs supervision." (§ 11150, subd. 2(J).) The parties further agreed that this status applies only "when no significant amount of work other than the foregoing is required" (*ibid.*), and that the phrase "significant amount of work" means duties that constitute greater than 20 percent of the weekly worktime. The parties also agreed that the term "supervision" includes various caregiving functions in which the employee assists an elderly client with daily living activities (as detailed in the instruction below). Thus, the court prepared a special instruction (Special Instruction No. 1) reflecting these concepts. The first three paragraphs of this instruction read:

"1. 'Personal Attendant' . . . means any person employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, to supervise, feed or dress a child or person who by reason of advanced age, physical disability or mental deficiency needs supervision. The status of 'Personal Attendant' shall apply when no significant amount of work other than the foregoing is required.

"2. The term 'supervision' as used in these instructions is limited and may include certain work duties essential for the independent living of the

supervised person [and the] person by virtue of his or her condition can not personally perform those functions such as bathing, showering, getting into or out of bed or chair, toileting, accessing medical care, accessing medicines which are ordinarily self administered by an individual, communication assistance by phone or other media, money management limited to maintaining activities of daily living, shopping for the personal groceries and personal items of the supervised individual, and housework limited to the direct personal space occupied by the supervised person.

"3. The exemption for 'personal attendant' shall not apply when the employee performs significant work duties other than the supervision, care and feeding of the supervised person. Significant work is defined as duties which constitute greater than 20% of the weekly work time."

Neither party challenged these paragraphs of the instruction. However, the parties strongly disagreed about whether the jury should also be instructed on an additional exception to the definition of a "personal attendant" to exclude all individuals who regularly perform any type of health care function. Relying on several opinion letters prepared by the DLSE that discussed or referred to a sentence in a 1986 DLSE interpretive bulletin, Cash's attorney requested the court to instruct the jury that Cash "would not be a personal attendant if you find that she regularly provided the defendant with medication, or took her vital[] signs, or observed the defendant's general physical, emotional and medical condition, and reported those conditions. It does not matter how much time was spent performing these tasks as long as they were done on a regular basis."

Over Winn's objections, the court agreed to instruct the jury on these concepts, but modified the language. The court included this additional instruction as a fourth paragraph to Special Instruction No. 1. This fourth paragraph read: "Any worker whose employment duties require the regular administration of health care services such as the taking [of] temperatures or pulse or respiratory rate, or similar health care functions, or the administration of prescription medication other than medication ordinarily self administered by an individual, regardless of the amount of time such duties take does not qualify for the 'personal attendant' exemption." The court also instructed the jury that Winn had the burden to show Cash was an "exempt personal attendant."

*Closing Arguments*

During closing arguments, Cash's attorney focused primarily on the fourth paragraph of Special Instruction No. 1, arguing: "[P]aragraph four is really what this case is about. What this says is the defendant has to prove to you

with evidence that Ms. Cash, her duties did not require the regular administration of healthcare services, such as taking temperatures, pulse, respiratory rate or similar healthcare functions [including] . . . the blood sugar care, or the administration of prescription medication other than medication ordinarily self-administered by an individual. [¶] Here's the kicker, regardless of the time such duties take. So if she does *any of this* on a regular basis, doesn't matter how much time she spent doing it . . . . [¶] [W]hen it gets down to these duties, the . . . taking the blood sugar, the pulse, as long as it is done on a regular basis, that means [Cash is not] exempt, regardless of the time. And that's why we had a lot of evidence on that issue. She's not exempt [if] she does any of the duties . . . , the taking of the pulse rate, the blood sugar, if she does any of those, it means the defendant has not proven that she's exempt." (Italics added.) Counsel later reiterated that: "So what is this case about . . . ? Right back to that fourth paragraph, Special Jury Instruction 1. Regardless of the amount of time such duties take . . . , regardless the amount of time. So was she doing anything that would be similar to taking temperatures, pulse rate or respiratory rate? We know she took a pulse rate because of panic attacks . . . . [¶] [O]n a daily basis she took blood sugar. . . ."

In response, Winn's counsel highlighted the evidence showing that Cash's caretaking activities consisted primarily of "supervising, feeding and dressing" Winn. Winn's counsel urged the jury to reject Cash's testimony that she devoted a substantial amount of her worktime to cleaning and maintaining the household, emphasizing the contrary testimony of the defense witnesses, the small size of Winn's cottage, and Cash's conflicting statements on this issue. Counsel also urged the jury to reject Cash's testimony that she regularly checked Winn's pulse rate and Winn's blood-sugar levels, and argued that even if Cash did engage in these activities, they were a small part of her overall employment.

### Jury Verdict

On a special verdict form, the jury responded to three questions pertaining to the "personal attendant" issue. First, the jury answered "Yes" to the question: "Did plaintiff Joy Cash perform any of the duties of a personal attendant as defined in paragraphs one and two of Special Jury Instruction No. 1?" Second, the jury answered "No" to the question: "Did plaintiff Joy Cash spend more than 20% of her weekly work time performing *other* duties for defendant Iola Winn as described in paragraph three of Special Jury Instruction No. 1?" (Italics added.) Third, the jury answered "Yes" to the question: "Did plaintiff Joy Cash's employment duties require the regular administration of health care services as described in paragraph four of Special Jury Instruction No. 1, regardless of the amount of time it took to perform such duties?"

Based on these findings, and the jury's finding as to the amount of outstanding overtime pay, the court entered judgment in Cash's favor for $123,205.80, which included $33,711.50 in overtime wages, $14,083.40 in prejudgment interest, and $72,380.50 in statutory attorney fees.

### *Posttrial Motions*

Winn moved for a JNOV and a new trial. She argued primarily that the fourth paragraph of Special Instruction No. 1 was an incorrect statement of the law. She also argued she was entitled to judgment as a matter of law based on the jury's express findings that she proved Cash performed the duties of a "personal attendant" and that Cash did not spend more than 20 percent of her time on other tasks. The court denied the motions.

### DISCUSSION

I.  *Court Erred in Instructing on Health Care Exception to "Personal Attendant"*

Winn contends the court erred by including the fourth paragraph in Special Instruction No. 1 regarding the "regular administration of health care services" exception to the personal attendant exemption rule set forth in Wage Order No. 15. Winn argues this exception does not exist under California law as applied to a household employee who is not licensed or trained to perform nursing or other medical services.

### A.  *Generally Applicable Legal Principles*

██ Under California law, an employee must be compensated at overtime rates if he or she works in excess of eight hours per day or in excess of 40 hours per workweek. (Lab. Code, § 510, subd. (a).) However, the Legislature authorized the IWC to establish exemptions to this statutory requirement "for executive, administrative, and professional employees, provided that the employee is primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercises discretion and independent judgment in performing those duties, and earns [a specified minimum salary]." (Lab. Code, § 515, subd. (a); see *Zelasko-Barrett v. Brayton-Purcell, LLP* (2011) 198 Cal.App.4th 582, 585 [131 Cal.Rptr.3d 114].)

The IWC thereafter promulgated Wage Order No. 15, which governs minimum wage and overtime protections for individuals who work in "household occupations." " 'Household Occupations' " is defined to mean "all services related to the care of persons or maintenance of a private household or its premises by an employee of a private householder. Said occupations

shall include, but not be limited to, . . . butlers, chauffeurs, companions, cooks, day workers, gardeners, graduate nurses, grooms, house cleaners, housekeepers, maids, practical nurses, tutors, valets, and other similar occupations." (§ 11150, subd. 2(I).)

■ Because a wage order is a quasi-legislative regulation, we apply "ordinary principles of statutory interpretation" in interpreting its meaning. (*Singh v. Superior Court* (2006) 140 Cal.App.4th 387, 392 [44 Cal.Rptr.3d 348]; accord, *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026 [139 Cal.Rptr.3d 315, 273 P.3d 513] (*Brinker*).) In doing so, we "turn[] first to the words, attempting to give effect to the usual, ordinary import of the language and to avoid making any language mere surplusage. [Citations.] When the language is clear, we must apply that language without further interpretation. [Citation.] 'If there is no ambiguity in the language . . . , "then the [IWC] is presumed to have meant what it said, and the plain meaning of the language governs." ' [Citation.] [¶] Only when the [regulatory] language is ambiguous and susceptible of more than one reasonable interpretation do 'we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the [entire] scheme of which the [regulation] is a part. [Citations.]' [Citation.] [¶] Furthermore, we must select a construction that comports most closely with the apparent intent . . . , with a view to promoting rather than defeating the general purpose of the [regulation], and avoid an interpretation that would lead to absurd consequences. [Citation.]" (*Singh, supra,* 140 Cal.App.4th at pp. 392–393.)

■ State wage and hour laws "reflect the strong public policy favoring protection of workers' general welfare and 'society's interest in a stable job market.' [Citations.]" (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1009 [118 Cal.Rptr.3d 834]; see *Brinker, supra,* 53 Cal.4th at pp. 1026–1027.) Thus, exemptions to overtime pay requirements "are narrowly construed." (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794 [85 Cal.Rptr.2d 844, 978 P.2d 2].) "They are applied only to those employees ' "plainly and [unmistakably] within their terms and spirit." ' [Citations.]" (*United Parcel Service, supra,* 190 Cal.App.4th at p. 1010.) "Moreover, the assertion of an exemption . . . is . . . an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." (*Ramirez, supra,* 20 Cal.4th at pp. 794–795.)

## B. *Analysis*

■ Wage Order No. 15 exempts executive, administrative, and professional household employees from certain wage and hour regulations. However, the wage order specifically provides that "registered nurses employed to

engage in the practice of nursing, shall not be considered exempt professional employees . . . unless they individually meet the criteria established for . . . executive or administrative employees" or unless the nurse falls within certain specialized "advance practice" nurse categories, such as certified nurse midwives, nurse anesthetists, and nurse practitioners. (§ 11150, subd. 1(A)(3)(f), (g).) Under these provisions, registered nurses who are employed to perform nursing services in the home are generally not exempt employees and therefore must be paid overtime, just as they would in a nonhousehold setting.

■ On the other hand, Wage Order No. 15 specifically provides that "personal attendants" *are* exempt from statutory overtime requirements. (§ 11150, subd. 1(B).) The wage order defines a " 'Personal attendant' " to "include[] baby sitters and means any person employed by a private householder or by any third party employer . . . to supervise, feed, or dress a child or person who by reason of advanced age, physical disability, or mental deficiency needs supervision. The status of 'personal attendant' shall apply when no significant amount of work other than the foregoing is required." (§ 11150, subd. 2(J).)

■ Under the plain language of this provision, an employee is a personal attendant if the work is directed primarily at supervising, feeding, or dressing the client. (§ 11150, subd. 2(J).) As interpreted by the DLSE, the word "supervision" with respect to an elderly client generally refers to assisting the person with daily tasks to allow the individual to remain living at home.[2] Consistent with this interpretation, the parties agreed on an instruction describing the types of activities that fall within the "supervision" category, to include assistance with bathing, showering, accessing medicines, money management, and housework limited to the direct personal space of the supervised person.

Further, under the express terms of Wage Order No. 15, the personal attendant definition applies only "when no significant amount of work other than the foregoing [(supervising, feeding, or dressing)] is required." (§ 11150, subd. 2(J).) The court instructed the jury that a "significant" amount of work means tasks that take more than 20 percent of the employee's time. This definition was based on a Court of Appeal decision (see *Cardenas v. Mission Industries* (1991) 226 Cal.App.3d 952, 958 [277 Cal.Rptr. 247], disapproved on another ground in *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 370 [127 Cal.Rptr.2d 516, 58 P.3d 367]), the DLSE's prior interpretations

---

[2] (See Dept. of Industrial Relations, DLSE, Commissioner & Chief Donna M. Dell, Opn. Letter No. 2005.11.23, Interpretation of IWC Wage Order 15: Definition of "personal attendant." (Nov. 23, 2005) <http://www.dir.ca.gov/dlse/opinions/2005-23.pdf> [as of May 14, 2012].)

(see DLSE Enforcement Policies and Interpretations Manual (2002 rev.), § 55.3.3 (DLSE Manual)), and a federal regulation (29 C.F.R. § 552.6 (2011)) interpreting an analogous federal provision.[3] This 20 percent rule appears to be a reasonable interpretation of the wage order, and because neither party challenges this rule, we assume for purposes of this decision that it reflects a correct interpretation.

The issue here, however, is whether a person, who is not a licensed nurse of any type (professional, registered, graduate, or trained) and whose work is primarily (more than 80 percent of the time) that of a personal attendant as defined above, loses his or her status as a personal attendant because the employee regularly performs any health-care-related services, such as taking a "temperature[] or pulse" or assisting with over-the-counter blood sugar tests. In other words, does a caretaker for an elderly person fall outside the "personal attendant" definition merely by spending a few minutes each day on these routine health-related tasks, even if the employee spends more than 80 percent of his or her time supervising, feeding, or dressing the elderly individual?

██ The answer is no. There is no California case law supporting this exception to the personal attendant definition.[4] And there is nothing in the provisions of Wage Order No. 15 providing an exception to the personal attendant definition for an individual who engages in "regular administration of health care services," but who is not a trained health care provider. The express language of the " 'Personal attendant' " definition applies to an employee who is engaged to "supervise, feed, or dress" a client if the employee spends a significant amount of his or her time on these tasks. (§ 11150, subd. 2(J).) This language cannot be reasonably interpreted to mean that the employee falls outside the definition if the employee regularly engages in a single "health care" related task (including "taking temperatures or pulse or respiratory rate"), regardless whether these services are an incidental or minor part of the caretaker's work.

Moreover, such an interpretation would be inconsistent with the policy underlying the narrow personal attendant exemption rule, which seeks to control home care costs for elderly individuals who need help with daily

---

[3] The Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) provides an overtime pay exemption for in-home caretakers. (29 U.S.C. § 213(a)(15).) The federal and state laws pertaining to caretakers are similar in some respects, but federal law is somewhat more expansive as to the type of work that may be included within the definition of supervising. (See 29 C.F.R. § 552.6 (2011); DLSE Manual, *supra*, § 55.3.3.)

[4] The only reported California decision on the personal attendant exemption concerned the issue whether a babysitter was a personal attendant if a significant amount of her work was unrelated to the child care. (*Cardenas v. Mission Industries, supra*, 226 Cal.App.3d at p. 959.)

living activities and thus avoid the need for institutionalization, while maintaining the overtime pay requirements for all other types of domestic work. (See *McCune v. Oregon Senior Services Division* (9th Cir. 1990) 894 F.2d 1107, 1110 [interpreting exemption under federal law].) An in-home caretaker's work providing assistance to elderly individuals who cannot care for themselves will almost always involve some form of health-care-related function. Even where the caregiver's main job is to provide assistance with day-to-day activities, it would be difficult to conceive of a situation where the employee had no responsibility for any tasks related to the health of the elderly individual. If we were to recognize a blanket exception to the personal attendant exemption for a caregiver who regularly engages in *any* regular health care related tasks (including tasks generally performed by family members such as checking a pulse rate or taking a temperature or helping with medication) regardless of whether the services are incidental to the main caretaking job, the personal attendant exemption would be eliminated with respect to care for elderly persons. The IWC would not have intended this result.

Our conclusion is also supported by the provisions of Wage Order No. 15 relating to in-home nursing employees. The wage order specifically provides that certain categories of licensed registered nurses who work in the home providing nursing services are not exempt from overtime regulations (§ 11150, subd. 1(A)(3)(f), (g)), leading to a reasonable inference that the IWC did not intend to extend this exception to other categories of individuals (such as caregivers who are not nurses) merely because a small portion of their work can be characterized as health care services. Under federal law, there is an analogous overtime pay exemption for in-home caregiving work referred to as "companionship services" (29 U.S.C. § 213(a)(15)), and the implementing federal regulation expressly states that " 'companionship services' does not include services relating to the care and protection of the aged or infirm *which require* and are performed by trained personnel, such as a registered or practical nurse. . . ." (29 C.F.R. § 552.6 (2011), italics added.) This trained-personnel exception to the personal attendant exemption is not specifically contained in the personal attendant provisions of Wage Order No. 15. But even assuming the IWC intended to include such an exception, the exception would not be applicable here because the undisputed evidence showed that Cash was not a trained nurse and there was no evidence or argument that Cash engaged in activities that could only be performed by a trained or licensed nurse.

To support the propriety of the fourth paragraph of Special Instruction No. 1, Cash relies primarily on three DLSE opinion letters, dated February 3, 1994, October 3, 1994, and October 21, 1997.[5] These letters are not helpful on the issue before us.

In two of the letters, the DLSE chief counsel referred to a health care services exception to the wage order's "personal attendant" definition by referencing a rule promulgated in Interpretive Bulletin 86-1. (DLSE Opn. Letters Nos. 1994-10-03-2 & 1994-02-03-2.) Interpretive Bulletin 86-1 was issued by the Labor Commissioner on March 12, 1986, and is contained in the DLSE's former 1989 Operations and Procedures Manual.[6] The bulletin discusses certain amendments to the wage orders, including changes clarifying that personal attendants working in private households are exempt even if they are employed by a third party agency.

The last section of Interpretive Bulletin 86-1 additionally discusses the " 'no significant amount of other work' " requirement of the "personal attendants" definition, and concludes as follows: "Usually, such 'other' work involves housekeeping duties. It should be noted that practical nurses are explicitly covered by Order 15 and may not be exempted as personal attendants even though many of their duties are the same. *Any worker who regularly gives medication or takes temperatures or pulse or respiratory rate, regardless of the amount of time such duties take, falls within some classification of nurse, licensed or unlicensed.*" (Italics added.) The February 1994 and October 1994 DLSE opinion letters cited by Cash quote from the last sentence of this paragraph, leading Cash to argue, and the trial court to agree, that it should instruct the jury in the language of this sentence. (DLSE Opn. Letters Nos. 1994-10-03-2, 1994-02-03-2.)

In *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*), the California Supreme Court "held that all of the DLSE's interpretive policies contained in its 1989 operations and procedures manual [are] regulations that [are] void because

---

[5] (See Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1997.10.21.1, Practical Nurse v. Personal Attendants (Oct. 21, 1997) <http://www.dir.ca.gov/dlse/opinions/1997-10-21-1.pdf> [as of May 14, 2012] (DLSE Opn. Letter No. 1997-10-21-1); Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1994.10.03.2, Personal Attendants (Oct. 3, 1994) <http://www.dir.ca.gov/dlse/opinions/1994-10-03-2.pdf.> [as of May 14, 2012] (DLSE Opn. Letter No. 1994-10-03-2); Dept. of Industrial Relations, DLSE, Chief Counsel H. Thomas Cadell, Jr., Opn. Letter No. 1994.02.03.2, Personal Attendant Exemption—Wage Order 15 (Feb. 3, 1994) <http://www.dir.ca.gov/dlse/opinions/1994-02-03-2.pdf> [as of May 14, 2012] (DLSE Opn. Letter No. 1994-02-03-2).)

[6] On its own motion, this court took judicial notice of Interpretive Bulletin 86-1. (Evid. Code, § 452, subd. (c).)

they had not been promulgated in compliance with the Administrative Procedure Act . . . ." (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 563 [67 Cal.Rptr.3d 468, 169 P.3d 889].) The *Tidewater* court held those void regulations are "entitled to no deference" with respect to the proper interpretation of IWC wage orders. (*Gattuso, supra,* at p. 563; see *Tidewater, supra,* at p. 572.) Since *Tidewater,* many courts have reiterated that the DLSE interpretive policies contained in the earlier DLSE manuals have *no* persuasive value and are entitled to *no* deference even if the policy reflects the DLSE's "long-standing" interpretation of a wage order. (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581–582 [94 Cal.Rptr.2d 3, 995 P.2d 139]; see *United Parcel Service Wage & Hour Cases, supra,* 190 Cal.App.4th 1001, 1011; *California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 25 [4 Cal.Rptr.3d 785]; *Marin v. Costco Wholesale Corp.* (2008) 169 Cal.App.4th 804, 815 [87 Cal.Rptr.3d 161].)

Cash contends this rule prohibiting reliance on a former DLSE interpretive bulletin does not extend to matters contained in DLSE opinion letters, which are "advisory" opinions issued by the agency.

■ We agree that a DLSE opinion letter is not void on its face merely because it was issued without following the Administrative Procedure Act (Gov. Code, § 11340 et seq.; APA) rulemaking provisions. Unlike DLSE interpretive policies, advice letters are not subject to the rulemaking provisions of the APA because they generally reflect an opinion on enforcement of the wage orders with respect to a specific factual circumstance. (See *Morillion v. Royal Packing Co., supra,* 22 Cal.4th at p. 584; *Tidewater, supra,* 14 Cal.4th at p. 571; see also *United Parcel Service Wage & Hour Cases, supra,* 190 Cal.App.4th at p. 1011.) "The DLSE's opinion letters, . . . ' " ' "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " ' [Citations.]" (*Brinker, supra,* 53 Cal.4th at p. 1029, fn. 11.) However, DLSE opinion letters are not controlling (*ibid.*), and need not be followed if they do not contain persuasive logic or if they unreasonably interpret a wage order. (See *Harris v. Superior Court* (2011) 53 Cal.4th 170, 190 [135 Cal.Rptr.3d 247, 266 P.3d 953] ["[a]lthough we generally give DLSE opinion letters 'consideration and respect,' it is ultimately the judiciary's role to construe the language" of the wage orders]; see also *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 6–15 [78 Cal.Rptr.2d 1, 960 P.2d 1031].)

Without providing any analysis, the two 1994 DLSE opinion letters relied upon by Cash merely quote from the rule set forth in Interpretive Bulletin 86-1 pertaining to the definition of a personal attendant. (See DLSE Opn. Letters Nos. 1994-10-03-2 & 1994-02-03-2.) In the February 3, 1994 letter, the DLSE's chief counsel states he "find[s] that the Interpretive Bulletin

correctly reflects the law" pertaining to the exception for a personal attendant, " ' "licensed or unlicensed," ' " who " 'regularly gives medication or takes temperatures or [a] pulse,' " but the DLSE counsel provides no explanation for why this exception is supported by, or consistent with, the language of the wage order's personal attendant definition. (DLSE Opn. Letter No. 1994-02-03-2.) In the October 3, 1994 letter, the DLSE's chief counsel similarly quotes from the Interpretive Bulletin 86-1, without any explanation of the basis for the exception. (DLSE Opn. Letter No. 1994-10-03-2.) The fact that the DLSE opinion letters restate (without any analysis) a rule contained in a void interpretive bulletin does not establish a principled basis to support the validity of the rule.

With respect to the third DLSE opinion letter relied upon by Cash, the DLSE was responding to an inquiry about the distinction between a "personal attendant" and a licensed "practical nurse." (DLSE Opn. Letter No. 1997-10-21-1.) The DLSE's chief counsel concluded that "the distinction between the services or procedures performed by a practical (or vocational) nurse and those performed by a personal attendant is easily drawn: the personal attendant is employed only to supervise, feed and dress the individual and may not engage in those procedures which are *exclusively limited* to the nursing profession. The nurse is primarily employed to supervise the individual in regard to their health needs and is allowed to perform the services and procedures provided in their license." (*Ibid.*, italics added.) This distinction is consistent with our conclusion here. The fact that Cash engaged in some incidental nursing tasks that did not require a nursing license (see Bus. & Prof. Code, § 2727, subd. (b)), and thus were not *exclusively limited* to the nursing profession, did not necessarily take her outside the wage order's personal attendant definition. (§ 11150, subd. 2(J).) The court instructed the jury that a caretaker's regular performance of *any* health-care-related services *automatically* takes the employee outside the personal attendant definition. The October 21, 1997 DLSE opinion letter does not support the existence of this broad exception.

Aside from the DLSE opinion letters, Cash argues that the fourth paragraph of Special Instruction No. 1 was appropriate because the word "supervise" cannot be logically "stretched to encompass an employee performing . . . medical or health care functions for an elderly person" and that "the term supervise cannot include one performing medical or health care services for another."

We agree that when a person performs nursing-type functions, these functions may fall outside the scope of a personal attendant as that phrase is defined in Wage Order No. 15. However, the jury here was expressly instructed as to the limited definition of the term "supervision," which did

not include health care functions (except for incidental services such as helping with the taking of prescription medication). Cash did not request a specific instruction informing the jury that her activities pertaining to checking Winn's pulse and assisting with the blood-sugar tests fell outside the supervision function of a caregiver. However, the jury was fully permitted to reach this conclusion based on the definitions given in the first three paragraphs of Special Instruction No. 1.

▮ Further, as explained below, the erroneous instruction was prejudicial because the undisputed evidence at trial and the jury's findings show the claimed nursing functions *were* an incidental or a minor part of Cash's job. Based on Cash's description of her "healthcare" services, her admission that she had no formal training or license in nursing services, and the jury's finding that she spent no more than 20 percent of the job performing services other than to "supervise, feed or dress" Winn, the record shows as a matter of law that Cash was a " 'Personal attendant' " within the meaning of Wage Order No. 15. (§ 11150, subd. 2(J).)

## II. *Court Erred in Denying Winn's JNOV Motion*

Winn also contends the court erred in denying her JNOV motion.

▮ " ' " " 'A motion for [JNOV] may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]" ' [Citation.]" (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d 266].) In reviewing an order denying a JNOV, we draw all reasonable inferences in favor of the jury's verdict. (*Ibid.*)

In this case, the jury expressly found (1) Cash performed the duties of a personal attendant as defined in the first and second paragraphs of Special Instruction No. 1 and (2) Cash did *not* spend more than 20 percent of her weekly worktime performing other duties, as described in the third paragraph of Special Instruction No 1. Based on these findings, Cash met the definition of a personal attendant within the meaning of Wage Order No. 15. (§ 11150, subd. 2(J).) Cash does not dispute the propriety of the first, second, or third paragraphs of the instruction, and does not suggest any basis upon which she could prevail if we were to remand for a retrial without the erroneous instruction.

Cash argues only that substantial evidence at trial showed her employment tasks consisted primarily of providing health care to Winn, emphasizing the

facts that she was hired by the family to assist in controlling Winn's diabetes and that she regularly tested Winn's blood-sugar levels and prepared meals to keep Winn's blood-sugar levels under control. However, Cash made this argument to the jury, and the jury rejected it. The jury specifically found that Cash's primary duties involved supervising, feeding and dressing Winn, and that the other duties (such as health-care-related functions) were not a major or significant part of the job. Based on this finding, Cash was a personal attendant as a matter of law and thus exempt from overtime pay requirements. Thus, the court should have granted Winn's motion for JNOV and entered judgment in Winn's favor.

## DISPOSITION

Judgment is reversed. The matter is remanded for the court to vacate the judgment and enter a judgment in favor of Winn. Respondent to bear appellant's costs on appeal.

O'Rourke, J., and Irion, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 15, 2012, S203545.