[No. A133202. First Dist., Div. Two. Feb. 11, 2013.]

ADELINA TAPIA GUERRERO, Petitioner, v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent;
JO WEBER, as Director, etc., et al., Real Parties in Interest.

916

COUNSEL

California Rural Legal Assistance, William Hoerger and Robert J. Lotero for Petitioner.

Eunice Hyunhye Cho for National Employment Law Project as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Bruce Goldstein, County Counsel, Jeffrey L. Berk and Joshua A. Myers, Deputy County Counsel, for Real Parties in Interest.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Real Parties in Interest.

---

**OPINION**

**KLINE, P. J.—**

## INTRODUCTION

Petitioner Adelina Tapia Guerrero was employed to provide in-home support services (IHSS) to eligible recipients in Sonoma County (County) under the In-Home Support Services Act. (Welf. & Inst. Code, § 12300 et seq.)[1] She was never paid for any of the services she rendered to program recipient Alejandra Buenrostro from November 4, 2008, through January 29, 2009, despite a comprehensive scheme of federal and California statutes, implemented within County through enactment of local ordinances that spell out the responsibilities of County and the Sonoma County In-Home Supportive Services Public Authority (Public Authority) for establishing and monitoring IHSS providers' wages, hours, and conditions of employment. She contends that County and Public Authority were her "joint employers" with Buenrostro for purposes of her federal and state wage and hour claims. The Sonoma County Superior Court rejected this contention, sustaining without leave to amend the demurrer of real parties in interest Jo Weber, as Director of the Sonoma County Department of Human Services, and Michael Humphrey, as manager of the Public Authority, as to her causes of action for unpaid wages and overtime under the Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.), California statutes (Lab. Code, §§ 1182.12, 1194, 1194.2, 1197; Welf. & Inst. Code, §§ 12301.6, subd. (c)(1), 12302.25) and Industrial Welfare Commission (IWC) wage order No. 15-2001 (Cal. Code Regs., tit. 8, § 11150 et seq.).

Guerrero seeks extraordinary relief from the order. She contends the superior court erred in determining that real parties in interest County and

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

Public Authority were not her "employers" or "joint employers" with other defendants for purposes of her federal and state wage and hour claims and by failing to consider whether real parties in interest acted "in the interest of an employer in relation to [her]" under the FLSA. (29 U.S.C. § 203(d).) She further contends that the superior court erred in sustaining real parties in interest's demurrer to her claims for unpaid wages, based upon its determinations that her job classification was exempt from federal and state wage and hour laws and that the California wage and hour laws upon which she relied did not apply to public entities. Underlying these contentions is Guerrero's assertion that disputed material facts exist as to all of these issues, so that the sustaining of demurrers to her wage and hour claims was error.

We shall conclude the superior court erred in sustaining the demurrer to Guerrero's federal and state wage and hour claims.

## FACTS AND PROCEDURAL BACKGROUND

### A. The first amended complaint

On February 22, 2011, Guerrero filed the instant first amended complaint naming as defendants real parties in interest County and Public Authority and defendants Buenrostro and Sherry Amezcua.[2] The complaint alleged as follows: Buenrostro was disabled and a recipient and a consumer of IHSS services as provided in an interagency agreement between County and Public Authority and a memorandum of understanding between the Public Authority and Service Employees International Union (SEIU), effective October 1, 2007, through September 30, 2009. County and Public Authority authorized Buenrostro and Amezcua to hire and engage an IHSS provider and they engaged Guerrero to provide IHSS services from November 4, 2008, through January 29, 2009. Guerrero provided services seven days a week, for seven hours a day and had worked no fewer than 501 hours regular time and not less than 87 hours of overtime. Guerrero alleged she performed general household work exceeding 20 percent of her total weekly hours worked. Guerrero provided services to Buenrostro at all times under the supervision and direction of Amezcua. Buenrostro, Amezcua and real parties in interest County and Public Authority failed to pay her for the personal services she rendered to Buenrostro and refused to pay minimum wages and overtime premium wages owed.

The first amended complaint further alleged that each defendant (County, Public Authority, Buenrostro and Amezcua) employed Guerrero and either

---

[2] Our analysis refers to Buenrostro as the recipient of services and an employer of Guerrero. The complaint alleges that Amezcua was also authorized to act on behalf of Buenrostro, was authorized by County to hire the service provider for Buenrostro and to supervise the provider on her behalf. References to Buenrostro therefore generally include Amezcua where relevant.

directly or indirectly exercised control over her wages or hours or conditions of employment or all of the foregoing. It further alleged that in failing to pay Guerrero minimum wages and overtime premium wages owed for her personal services, all defendants, including real parties in interest, had violated the federal FLSA (29 U.S.C. § 201 et seq.), California statutes, including Labor Code section 1194, and IWC wage order No. 15-2001. In addition to federal and state wage and hour claims, the complaint also contained a cause of action for breach of a contract entered into by Buenrostro and Amezcua with County and Public Authority, to which Guerrero alleged she was a third party beneficiary, and for breach of the collective bargaining agreement entered into by County and Public Authority with SEIU and providers of IHSS in Sonoma County, to which Guerrero alleged she was a third party beneficiary.

## B. *Demurrer*

County and Public Authority filed a joint demurrer to the complaint, in which they argued: (1) Guerrero's federal wage and hour claims failed to state facts sufficient to constitute a cause of action against them because they were not her employer for purposes of her FLSA wage and hour claims; (2) alternatively, Guerrero's federal wage and hour claims failed because her job was exempt from the FLSA minimum wage and overtime provisions; (3) Guerrero's claims under the Labor Code failed because real parties in interest were not her employer for purposes of state wage and hour claims; and (4) alternatively, that her claims under state law failed because the relevant portions of the Labor Code did not apply to public entities such as real parties in interest. Real parties in interest also argued the breach of contract cause of action failed because Guerrero failed to comply with the requirements of the Government Claims Act. (Gov. Code, § 915.)

On July 18, 2011, the trial court filed its order sustaining real parties in interest's demurrer without leave to amend as to all federal and state statutory claims for minimum wages and overtime premium wages. The court overruled the demurrer as to the contractual cause of action, finding the complaint had adequately pleaded excuse from the Government Claims Act.

## C. *Writ proceedings*

On September 19, 2011, Guerrero filed a writ petition in this court, seeking extraordinary relief. On November 23, 2011, we issued an order to show cause why the relief requested in the petition should not be granted. On that date we also granted Guerrero's request for judicial notice of certain provisions of the State Department of Social Services Manual of Policies and Procedures: Social Services Standards, Service Program No. 7: In-Home

Supportive Services, pp. 50–115 (hereafter, DSS Manual) and of the State Department of Social Services County Fiscal Letter No. 10/11-43 (Dec. 13; 2010) and its attachment relating to funds allocated to counties for fraud investigations and program integrity activities.

Real parties in interest filed their answer and return on January 12, 2012. Guerrero's traverse was filed February 2, 2012. We granted requests of the California State Association of Counties to file an amicus curiae brief in support of real parties in interest and to the National Employment Law Project (NELP) to file an amicus curiae letter in support of Guerrero. Petitioner's answer to the amicus curiae brief filed by California State Association of Counties was filed on February 14, 2012, and oral argument was held.

## DISCUSSION

The threshold issue here is whether County, Public Authority, or both of them were Guerrero's "employer" for purposes of federal and state wage and hour laws. To assist in that determination, we describe in some detail the IHSS program and its implementation in Sonoma County.

## I.   The IHSS Program

A.   *Statutory background*

"IHSS is a state social welfare program designed to avoid institutionalization of incapacitated persons. It provides supportive services to aged, blind, or disabled persons who cannot perform the services themselves and who cannot safely remain in their homes unless the services are provided to them. The program compensates persons who provide the services to a qualifying incapacitated person." (*Basden v. Wagner* (2010) 181 Cal.App.4th 929, 931 [104 Cal.Rptr.3d 394].)[3] The statutory background of the IHSS program was described by the Third Appellate District in *Basden v. Wagner*:

"In 1973, the Legislature enacted the IHSS program to enable aged, blind or disabled poor persons to avoid institutionalization by remaining in their

---

[3] "The program was originated, and is largely funded, by the federal government. A state may participate in the program by paying a portion of the funding and complying with federal requirements. California participates in the IHSS program pursuant to . . . section 12300 et seq. The county administers the program locally on behalf of the state in accordance with the statute and state regulations establishing a uniform range of services available to all eligible recipients. (Welf. & Inst. Code, §§ 12301, 12301.1, 12302.) County social workers interview applicants for IHSS services and determine their eligibility and need for such services and the number of hours of service to which the applicant is entitled under the regulations. (Reg. 30-761.)" (*Service Employees Internat. Union v. County of Los Angeles* (1990) 225 Cal.App.3d 761, 765 [275 Cal.Rptr. 508], fns. omitted (*SEIU*).)

homes with proper supportive services. (Welf. & Inst. Code, § 12300 et seq.) [Footnote omitted.] 'Supportive services' are described in discrete categories, such as 'domestic services,' 'personal care services,' and 'protective supervision,' to name a few. [Footnotes omitted.] (§ 12300, subd. b).)[4]

"The Department [(the State Department of Social Services or DSS)] promulgates regulations that implement the program, and county welfare departments administer the program under the Department's supervision. Counties process applications for IHSS, determine the individual's eligibility and needs, and authorize services. The county either obtains and pays the provider of the services, or it pays the recipient who hires a provider. (*Miller v. Woods* (1983) 148 Cal.App.3d 862, 868 [196 Cal.Rptr. 69] (*Miller*).)

"The total amount of services provided to any one person is limited by statute. Severely impaired recipients may receive up to 283 hours per month, or approximately 65.4 hours per week, of supportive services paid through the program. Less severely impaired recipients may receive up to 195 hours per month, or approximately 45 hours per week. (§ 12303.4.)" (*Basden v. Wagner, supra*, 181 Cal.App.4th at pp. 933–934.)[5]

---

[4] Section 12300, subdivisions (b) and (c) identify the services included under the program as follows:

"(b) Supportive services shall include domestic services and services related to domestic services, heavy cleaning, personal care services, accompaniment by a provider when needed during necessary travel to health-related appointments or to alternative resource sites, yard hazard abatement, protective supervision, teaching and demonstration directed at reducing the need for other supportive services, and paramedical services which make it possible for the recipient to establish and maintain an independent living arrangement.

"(c) Personal care services shall mean all of the following:

"(1) Assistance with ambulation.

"(2) Bathing, oral hygiene, and grooming.

"(3) Dressing.

"(4) Care and assistance with prosthetic devices.

"(5) Bowel, bladder, and menstrual care.

"(6) Repositioning, skin care, range of motion exercises, and transfers.

"(7) Feeding and assurance of adequate fluid intake.

"(8) Respiration.

"(9) Assistance with self-administration of medications."

[5] Statutes adopted *after* the relevant time period here have mandated a 20 percent reduction in authorized hours of service to IHSS recipients, effective January 1, 2013. (§ 12301.07.) The State Department of Social Services (Department or DSS) *and counties are to work together to develop a process to allow for counties to preapprove IHSS care supplements*, to the extent permitted under federal law, where the recipient applies for the supplement and the county determines that the recipient is at serious risk of out-of-home placement as a consequence of the reduction in services. (§ 12301.07, subd. (b).) The Department is required to "inform providers of any reduction to recipient hours through a statement on provider timesheets, *after consultation with counties*." (§ 12301.07, subd. (d), italics added.)

The services that may be authorized through IHSS are specified in DSS Manual sections 30-757.11 through 30-757.19. (DSS Manual, § 30-757.1.) The Department must adopt regulations establishing a uniform range of services available to all eligible recipients based upon individual needs, subject to county plans developed in conformity with state law. (§§ 12301.1, 12302.) Counties evaluate the recipients based on those regulations and reassess periodically, but at least annually. (§ 12301.1) The Department, in consultation with the counties, must also "establish and implement statewide hourly task guidelines" and a standardized tool to assess recipient needs. (§ 12301.2, subd. (a); see § 12309.) Although County may authorize exceptions to the hourly task time guidelines for particular services based on factors set forth in the DSS Manual (see DSS Manual, § 30-757.1), no exception may result in the recipient's total hours exceeding the maximum monthly limits specified (*id.,* § 30-757.1(a)(4)).

Counties are tasked with performing "quality assurance activities," including establishing a dedicated, specialized unit or function to ensure quality assurance and program integrity, including fraud detection and prevention in the provision of services; performing routine reviews of supportive case services to ensure there are accurate assessments of needs and hours; developing, with the state, policies, procedures, timelines, and instructions under which counties will receive, resolve and respond appropriately to claims data match discrepancies or other information that indicates potential overpayments to providers or recipients or third party liability; monitoring the delivery of supportive services to detect and prevent potential fraud by providers, recipients and others to maximize recovery of overpayments. (§ 12305.71, subds. (a), (b), (c).) Such monitoring may include unannounced home visits to a recipient's home to verify the receipt of services. (§ 12305.71, subd. (c)(3)(A), (B).)

B.  *Sonoma County's implementation of the IHSS program*

"The California Legislature set eligibility standards and methods by which counties could provide in-home care. [(E.g., §§ 12302, 12304.)] The counties were responsible for the day-to-day operation of the programs." (*Bonnette v. California Health and Welfare Agency* (9th Cir. 1983) 704 F.2d 1465, 1467 (*Bonnette*).) "A county may deliver services under the IHSS program by (1) hiring in-home supportive personnel in accordance with established county civil services requirements, (2) contracting with a city, county, city or county agency, a local health district, a voluntary nonprofit agency, a proprietary agency or an individual, or (3) making direct payment to a recipient for the purchase of services. (Welf. & Inst. Code, § 12302.)" (*SEIU, supra,* 225 Cal.App.3d at p. 765; see *Bonnette, supra,* at p. 1467.) A county board of supervisors may also elect to either "[c]ontract with a nonprofit consortium to

provide for the delivery of in-home supportive services" (§ 12301.6, subd. (a)(1)) or *"[e]stablish, by ordinance, a public authority to provide for the delivery of in-home supportive services."* (§ 12301.6, subd. (a)(2), italics added.)

Pursuant to section 12301.6, in 2001, the Sonoma County Board of Supervisors chose to establish Public Authority to provide for the delivery of services. (Sonoma County Mun. Code, art. XXIV, §§ 2-358 through 2-360 (Ord. No. 5289 § 1 (part), 2001.) The County Board of Supervisors is the governing board of Public Authority. (*Id.*, § 2-361.) The board may abolish Public Authority by repealing the article establishing it. (*Id.*, § 2-371.)

Public Authority was established as a separate entity from County and was given all powers "necessary and convenient" to carry out the powers conferred by section 12300 et seq. and the Sonoma County Municipal Code, "including the power to contract for services pursuant to Welfare and Institutions Code [s]ections 12302 and 12302.1 . . . ." (Sonoma County Mun. Code, § 2-364, subd. (b).) Consequently, Public Authority has the power to determine the method of delivery of IHSS services to recipients and to contract with appropriate entities or individuals to deliver those services. (Sonoma County Mun. Code, § 2-364, subd. (b).)[6] Public Authority also has the authority to provide for delivery of services by direct payment to a provider chosen by the recipient. (§ 12301.6, subd. (d).)

Public Authority was charged with implementing the goals and objectives of section 12301.6, including, but not limited to (1) establishing a registry to provide assistance to recipients in finding providers; (2) investigating the qualifications and background of potential providers; (3) establishing a referral system under which providers shall be referred to recipients; (4) providing for training for providers and recipients;[7] (5) performing any other functions related to the delivery of in-home supportive services; and (6) assuring that the requirements of the personal care option under federal law are met. (§ 12301.6 (a)–(e); Sonoma County Mun. Code, § 2-363, subds. (a)–(c).)

---

[6] "The authority shall be a corporate public body, exercising public and essential governmental functions with all powers necessary and convenient to carry out the powers conferred upon it by Welfare and Institutions Code [s]ections 12300 et seq. and this chapter, including the power to contract for services pursuant to Welfare and Institutions Code [s]ections 12302 and 12302.1, subject to any limitations set forth in this article." (Sonoma County Mun. Code, § 2-364, subd. (b).)

[7] However, the Public Authority "shall not be obligated to provide training directly, to pay for training provided privately or in the community, to pay for the providers' time spent in training, to accompany recipients to training, to pay for transportation to training or to pay for any materials required by the training. The authority shall not be obligated to ensure that any provider or recipient attend or complete any training." (Sonoma County Mun. Code, § 2-363, subd. (c).)

Recipients may elect to receive services from providers who are not referred to them by the Public Authority. However, those providers *must be referred to the Public Authority "for the purpose of wages, benefits, and other terms and conditions of employment."* (§ 12301.6, subd. (h), italics added.)

At all times relevant here, Public Authority was "deemed to be the employer" of IHSS providers for purposes of collective bargaining under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.; hereafter the MMBA.) (§ 12301.6, subd. (c)(1); accord, Sonoma County Mun. Code, § 2-364, subd. (e).) However, "[r]ecipients shall retain the right to hire, fire, and supervise the work of any in-home supportive services personnel providing services to them." (§ 12301.6, subd. (c)(1); see Sonoma County Mun. Code, § 2-364, subd. (e) ["Nothing in these enumerated powers shall be construed to limit or interfere with the rights of IHSS recipients to hire, fire and supervise the work of any worker providing services to them."].)

Public Authority is *not* responsible for (1) authorizing services for a recipient; (2) determining a recipient's need for services, the level and quality of services required, or the eligibility of recipients; (3) conducting assessments of the need for services; and "[t]erminating the recipient's participation in the IHSS program." (Sonoma County Mun. Code, § 2-363, subd. (d).) These services and functions are "the exclusive responsibility of the [C]ounty of Sonoma." (*Ibid.*)

County, therefore, makes the threshold determination whether an individual is financially eligible for IHSS services, the level of services required, and the number of hours of service to which the recipient is entitled under the statutes and regulations. County also enters the provider's timesheet into a database maintained by the state. The state issues the checks to the providers. County also "[a]uthorize[s] the disbursement of all funds paid . . . by: [¶] (1) [r]eviewing all time sheets prior to entry of time sheet data into the system to ensure consistency between hours reported and hours authorized [and by] [¶] (2) [r]eviewing any significant discrepancies between hours reported and hours authorized to determine the reason and take corrective action as indicated." (DSS Manual, § 30-769.241(c)(1), (2).) The state has the responsibility for the state payroll system, unemployment insurance, and workers' compensation for service providers. (§§ 12301.6, subd. (i), 12302.2; Sonoma County Mun. Code, § 2-364, subd. (f).) Where a county provides for direct payment to a provider chosen by a recipient, as County does here,[8] the state either performs or assures the performance of all the recipient's obligations as

---

[8] Real parties in interest state that County processed the timesheets provided by the recipients for the state, and the state then made payments directly to the "provider." Real parties in interest cite section 12302.2, subdivision (b), which provides for the State Controller to make any authorized deductions from the wages of providers.

an employer, relating to unemployment compensation, disability benefits, workers' compensation, federal and state income tax and federal old-age survivors and disability insurance benefits. (§ 12302.2.)

Public Authority is "deemed *not to be the employer* of in-home supportive services personnel referred to recipients under this section for purposes of liability due to the negligence or intentional torts of the in-home supportive services personnel." (§ 12301.6, subd. (f)(1), italics added; see Sonoma County Mun. Code, § 2-365, subd. (c).) Further, "[e]mployees of the public authority shall not be employees of the county for any purpose." (§ 12301.6, subd. (b)(2)(B); see Sonoma County Mun. Code, § 2-365, subd. (c).) Both the County and the state are "immune from any liability resulting from its implementation of Welfare and Institutions Code Sections 12301.6 et seq. in the administration of the In-Home Supportive Services." (Sonoma County Mun. Code, § 2-365, subd. (d); see § 12301.6, subd. (f)(3).)[9]

## II. Standard of Review

This action arises on the superior court's sustaining of real parties in interest's demurrer to Guerrero's causes of action for alleged violation of the FLSA and state wage and hour laws. Our standard of review is well established.

We review orders sustaining demurrers de novo. (*Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 297 [120 Cal.Rptr.3d 442] (*Sheppard*).) "[F]ollowing the sustaining of a demurrer without leave to amend, we assume the truth of all properly pleaded facts. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6 [40 Cal.Rptr.3d 205, 129 P.3d 394]; [citation].) We also accept as true all facts that may be implied or inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339]; [citation].)" (*Curcini v. County of Alameda* (2008) 164 Cal.App.4th 629, 633, fn. 3 [79 Cal.Rptr.3d 383] (*Curcini*).) We "liberally construe [the properly pleaded allegations of a challenged complaint] to achieve ' " 'substantial justice' " ' among the parties. (*American Airlines, Inc. v. County of San Mateo* (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198].)" (*Sheppard*, at p. 297.) If the trial court sustains a demurrer without leave to amend, we determine whether or not the plaintiffs could amend the complaint to state a cause of action. (*Curcini*, at p. 637.) The plaintiffs bear the burden of proving

---

[9] "Counties and the state shall be immune from any liability resulting from their implementation of this section in the administration of the In-Home Supportive Services program. Any obligation of the public authority or consortium pursuant to this section, whether statutory, contractual, or otherwise, shall be the obligation solely of the public authority or nonprofit consortium, and shall not be the obligation of the county or state." (§ 12301.6, subd. (f)(3).)

the trial court abused its discretion in denying leave to amend. (*Leonard v. John Crane, Inc.* (2012) 206 Cal.App.4th 1274, 1282 [142 Cal.Rptr.3d 700], quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) " 'We do not review the reasons for the trial court's ruling; if it is correct on any theory, even one not mentioned by the court, and even if the court made its ruling for the wrong reason, it will be affirmed. [Citations.]' (*Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1190–1191 [71 Cal.Rptr.3d 87].)" (*Curcini*, at pp. 637–638.)

### III. Real Parties in Interest as "Employers" or "Joint Employers" Under the FLSA[10]

In *Basden v. Wagner, supra,* 181 Cal.App.4th 929, the Court of Appeal recognized that "[t]he IHSS statutes treat providers as employees for some purposes, but not for all.

"IHSS providers work pursuant to various arrangements. Some are civil service employees of a county; some are employees of an entity that contracts with the county; some contract directly with the county or authorized entity; some are referred to the recipient by the authorized entity; and some contract directly with the recipient. (§§ 12301.6, 12302, 12302.1, 12302.25.)

"Each county is required to act as an 'employer,' or to establish an 'employer,' for IHSS providers for purposes of the state public employee-employer relations laws. (§ 12302.25, subd. (a).)

"Where a provider or a recipient receives direct payment from the county, the state is responsible for performing for the recipient a number of legal obligations an employer has for its employees, such as those related to unemployment compensation, unemployment compensation disability benefits, workers' compensation, federal and state income tax, and federal old-age survivors and disability insurance benefits. (§ 12302.2.) These 'employer' duties suggest providing IHSS full time could be considered an employment.

"However, providing IHSS-funded care is not an employment for all purposes. By statute, the entity that is deemed the provider's employer for employer-employee relations laws is expressly not deemed to be the provider's employer for purposes of liability due to the provider's negligence or intentional torts. (§ 12301.6, subds. (c)(1), (2)(A), (f)(1).)

---

[10] The FLSA mandates that employers must pay their employees at least the statutory federal minimum wage and overtime compensation for any employee working longer than 40 hours per week. (29 U.S.C. §§ 206(a)(1), 207(a)(1).)

"These marked differences in treatment by the IHSS statutes indicate that, at most, the Legislature defined IHSS providers as employees for limited circumstances, but undisputedly not for all circumstances." (*Basden v. Wagner, supra*, 181 Cal.App.4th at p. 940, italics omitted.)[11]

Guerrero contends the trial court erred in sustaining the demurrer to her cause of action for violation of the FLSA (29 U.S.C. § 201 et seq.). She argues that she sufficiently pled protected employee status, that the real parties in interest were her employers for purposes of FLSA wage protections, and that the trial court abused its discretion by making factual determinations as to the circumstances of the employment relationship in finding that real parties interest were not her employers.

## A. *Bonnette*

In 1983, the Ninth Circuit held that "under the FLSA's liberal definition of 'employer,' " the state and counties were employers of providers of in-home support services under California's IHSS program. (*Bonnette, supra*, 704 F.2d at p. 1470.) Treating the "ultimate question of whether a party is an

---

[11] *Basden v. Wagner, supra*, 181 Cal.App.4th 929, reversed a decision of the DSS, determining that a child was not eligible to receive IHSS services from her mother, on the ground that the mother was employed "full time" providing services under the IHSS program to the child's sibling and had not left that full-time employment to care for the child. (*Id.* at pp. 932–933.) According to the Court of Appeal, the Department's "nonsensical interpretation" (*id.* at p. 931) of section 12300, subdivision (e) preventing compensating a parent under the IHSS program for providing IHSS services to a child unless the parent has left "full-time employment" to care for the child "would frustrate the IHSS program's very purpose." (*Basden v. Wagner*, at p. 933, fn. omitted.) In this context, the appellate court held "[s]ection 12300(e)'s reference to full-time employment does not include providing in-home, full-time, IHSS-funded care by a parent to a child so as to bar the parent from being compensated for providing in-home, full-time, IHSS-funded care to another of her children." (*Ibid.*) In so holding, the court observed that the DSS's interpretation would require the state to pay more for services than might be required, as it would allow two people to provide protective supervision services in the plaintiff's home, and would pay each for their separate but overlapping time, when, under its own regulations, the state could prorate the two children's common need for protective supervision from their mother and, potentially, compensate the mother for roughly the same hours she would have rendered care if another caretaker were in the home for the other child. (*Id.* at p. 941.)

*Basden v. Wagner, supra*, 181 Cal.App.4th 929, is not determinative of the question in the wage and hour context presented here. There, the court did not analyze the term "employer" under the FLSA or California statutes, nor discuss the concept of joint employment. Rather, it focuses on the specific interpretation of the term "full-time employment" in the statute and determined that the Department's interpretation ran counter to the program's purpose (181 Cal.App.4th at p. 939), stating: "Whatever the phrase 'full-time employment' may mean, it does not mean, for purposes of section 12300(e), the full-time provision of IHSS-funded care by a parent to her child." (*Id.* at p. 941.)

'employer' as a legal issue" (*id.* at p. 1469),[12] the court of appeals concluded that state and county welfare agencies "exercised considerable control over the nature and structure of the employment relationship. They also had complete economic control over the relationship. The 'economic reality' was that the [agencies] employed the chore workers to perform social services for the benefit of the recipients. The fact that the [agencies] delegated to the recipients various responsibilities does not alter this; it merely makes them joint employers [with the recipients]." (704 F.2d at p. 1470.)

■ "Under the FLSA, 'employer' is defined as follows: [¶] ' "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . .' 29 U.S.C. § 203(d). The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes. [Citation.] The determination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity.' *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947). The touchstone is 'economic reality.' [Citation.]

"Two or more employers may jointly employ someone for purposes of the FLSA. [Citation.] All joint employers are individually responsible for compliance with the FLSA. 29 C.F.R. § 791.2(a) (1981). Regulations issued by the Department of Labor give the following examples of joint employment situations: [¶] '(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or [¶] (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.' 29 C.F.R. § 791.2(b) (footnotes omitted). The district court used a joint employment theory to find that the appellants were employers of the chore workers." (*Bonnette, supra,* 704 F.2d at pp. 1469–1470.)

■ The Ninth Circuit looked to the definition of employer under the FLSA and looked in particular to four factors commonly used by the courts to evaluate the " 'economic realit[y] of the work relationship' "—" 'whether the alleged employer (1) had the power to hire and fire the employees, (2)

---

[12] "Although the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts—whether appellants are employers within the meaning of the FLSA—is a question of law. [Citation.]" (*Bonnette, supra,* 704 F.2d at p. 1469; but see *Ling Nan Zheng v. Liberty Apparel Co., Inc.* (2nd Cir. 2010) 617 F.3d 182, 185 [in the context of a jury trial, the question whether a defendant is the plaintiffs' joint employer is a mixed question of law and fact and the jury's role is to apply the facts bearing on the multifactor employment inquiry to the legal definition of joint employer].)

supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.' In varying combinations, these factors have been considered by other courts for the same purpose. [Citations.] More important, these four factors are relevant to this particular situation." (*Bonnette, supra,* 704 F.2d at pp. 1469–1470.)

*Bonnette* embraced the four factors as providing "a useful framework for analysis in this case," while acknowledging they were "not etched in stone and will not be blindly applied. The ultimate determination must be based 'upon the circumstances of the whole activity.' *Rutherford,* 331 U.S. at 730, 67 S.Ct. at 1477." (*Bonnette, supra,* 704 F.2d at p. 1470.) *Bonnette* applied the four factors to the IHSS statutory scheme as it existed at that time, concluding it was "undisputed that the chore workers' wages were paid by appellants [the state and county agencies]." Regardless whether paid directly to the provider, to the recipient or in some combination, "the chore workers were paid by the appellants." (*Ibid.*) It was "also undisputed that the appellants controlled the rate and method of payment, and that they maintained employment records." (*Ibid.*) Further, the appellant state and county agencies "also exercised considerable control over the structure and conditions of employment by making the final determination, after consultation with the recipient, of the number of hours each chore worker would work and exactly what tasks would be performed. The recipients were responsible for the day-to-day supervision of the chore workers, but appellants intervened when problems arose which the recipient and the chore worker could not resolve. The district court found that the appellants 'had periodic and significant involvement in supervising the chore worker's job performance.' " (*Ibid.*)

The parties in *Bonnette, supra,* 704 F.2d 1465, disagreed about whether the state and county agencies had the power to hire and fire the chore workers. (*Id.* at p. 1470.) The Ninth Circuit pointed out that it was not the facts that were in dispute, but their characterization. "Appellants argue that it was the recipients who had the power to hire and fire, and the appellants only undertook these responsibilities when, for some reason, the recipient was incapable of carrying them out. The chore workers argue that the appellants' power to confer the grants on the recipients was in effect equivalent to the power to hire, and the power to terminate the grants amounted to the power to terminate the chore workers' employment. Regardless of whether the appellants are viewed as having had the power to hire and fire, their power over the employment relationship by virtue of their control over the purse strings was substantial." (*Ibid.*)

Applying these factors, *Bonnette* found as a matter of law that the state and counties were employers of the providers. (*Bonnette, supra,* 704 F.2d at p. 1470.)

The structure and operation of the IHSS program informing *Bonnette's* four factor analysis of the " 'economic realit[y]' " (*Bonnette, supra,* 704 F.2d at p. 1470) of the total employment relationship are remarkably similar to those that exist in the IHSS program as it functioned when Guerrero alleges she performed services and as it functions today:

*(1) Power to hire and fire.* As we have observed, the Ninth Circuit concluded in *Bonnette, supra,* 704 F.2d 1465, that, *"Regardless of whether the appellants are viewed as having had the power to hire and fire, their power over the employment relationship by virtue of their control over the purse strings was substantial."* (*Id.* at p. 1470, italics added.) The same is true today.

Furthermore, although the recipient retains the right to hire a provider who has *not* been referred by the public authority, those providers *must* be referred to the public authority *"for the purposes of wages, benefits, and other terms and conditions of employment."* (§ 12301.6, subd. (h), italics added.) Such requirement further supports the conclusion that County and Public Authority had substantial power over the employment relationship by virtue of their control of the purse strings and their control over the type of system they implemented to deliver IHSS program services. County even retains the authority to change the manner in which the provider payment is made and thus may "exercise direct hiring and firing control when it discerns that the work the state is paying for is not being performed in accordance with the assessment of need." (*In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720, 731 [199 Cal.Rptr. 697] (*In-Home Supportive Services v. WCAB*);[13] see DSS Manual, § 30-767.133 ["The county shall have the right to change from one to another of the three delivery methods outlined above [county employment, purchase of service from an agency, or purchase of service from an individual] or from payment in advance to payment in arrears" when the recipient uses his or her payment "for other than the purchase of authorized services."].)

Real parties in interest argue vigorously, and the trial court here agreed, that amendments to the statutes implementing the IHSS program, have

---

[13] "Moreover, delivery of the services in this manner substitutes for delivery of equivalent services by covered employees in institutions or by the employees of contractors in the home. We discern no reason or policy to expose workers who perform these services, as did [the IHSS worker], to differential exposure to uninsured status because of the choice of means by which the work is organized." (*In-Home Supportive Services v. WCAB, supra,* 152 Cal.App.3d at p. 731, fn. 11.)

superseded *Bonnette, supra*, 704 F.2d 1465. They contend that when *Bonnette* was decided, the prohibition against counties hiring, firing or supervising the IHSS recipients was not found in a *statute*, but rather in local ordinances subject to change by the counties. Real parties in interest maintain that since 1992, the amended IHSS statutes prohibit real parties in interest from hiring, firing, supervising or controlling how many hours an IHSS provider works. Relying on sections 12301.6, subdivision (c)(1),[14] 12302.2, subdivision (a),[15] and 12302.5, subdivision (b),[16] real parties in interest argue that because they are statutorily prohibited from hiring, firing, or supervising the providers, Guerrero is seeking to hold them liable for something they are statutorily prohibited from regulating. (See § 12302.25, added by Stats. 1999, ch. 90, § 6, p. 1658, eff. July 12, 1999.)

Real parties in interest's claim that the pre-1992 prohibitions against counties hiring, firing or supervising the IHSS recipients were not statutory, but rather the result of local ordinances subject to change by the counties, is not strictly accurate. For example, section 12302.2 today reads in all respects material to this litigation, the same as it read in 1983 when *Bonnette, supra*, 704 F.2d 1465, was decided. Section 12302.2, subdivision (a), states that where the state or a county "makes or provides for direct payment to a provider chosen by a recipient or to the recipient for the purchase of in-home support services," the DSS must either "perform or assure the performance of [the recipient's obligations as an employer]" for unemployment compensation, workers' compensation, income taxes and the like. The last sentence of section 12302.2, subdivision (a), read in 1983, as it does today: *"Nothing in this section shall be construed to permit any interference with the recipient's*

---

[14] Section 12301.6, subdivision (c)(1), establishes that the public authority shall be deemed the employer of the services provider for purposes of collective bargaining under the MMBA. Immediately following is the sentence: "Recipients shall retain the right to hire, fire, and supervise the work of any in-home supportive services personnel providing services to them."

[15] Section 12302.2 assures that where the county provides for direct payment to a provider chosen by a recipient, the state either performs or assures the performance of all the recipient's obligations as an employer, relating to unemployment compensation, disability benefits, workers' compensation, federal and state income tax and federal old-age survivors and disability insurance benefits. The statute also states that "[n]othing in this section shall be construed to permit any interference with the recipient's right to select the provider of services or to authorize a charge for administrative costs against any amount payable to or on behalf of a recipient." (§ 12302.2, subd. (a)(3).)

[16] Section 12302.5 provides:

"(a) Counties may establish entities or agents to act on behalf of the employers for those recipients who are designated as the employer of the in-home supportive services worker and who elect not to, or who are unable to, ensure compliance with all applicable federal, state, and county wage, hour, and workplace laws.

"(b) Any entity or agent established pursuant to this section shall not restrict or interfere with the right of a recipient to select, replace, and terminate the employment of his or her own provider of in-home supportive services and to set his or her own service schedule."

*right to select the provider of services* or to authorize a charge for administrative costs against any amount payable to or on behalf of a recipient." (Added by Stats. 1978, ch. 463, § 4, p. 1572, eff. July 18, 1978, italics added.)[17]

Similarly, in 1983, section 12304 provided in pertinent part, as it does today, that "[a]n individual who is eligible for services subject to the maximum amount specified . . . and who is capable of handling his or her own financial and legal affairs shall be given the option of hiring and paying his or her own provider of in-home supportive services. . . . An individual who is not capable of handling his or her own financial and legal affairs shall be entitled to receive the cash payment through his or her guardian, conservator, or protective payee." (Former § 12304, subd. (b),[18] as amended by Stats. 1982, ch. 115, § 48, p. 366, eff. Mar. 13, 1982.)

Section 12304.1 provided in 1983, as it does today, that in the selection of providers, "preference shall be given to any qualified individual provider who is chosen by any recipient of" IHSS personal care services. (Added by Stats. 1979, ch. 504, § 5, p. 1675; Stats. 1979, ch. 1071, § 5.5, p. 3787; see Historical and Statutory Notes, 74A West's Ann. Welf. & Inst. Code (2001 ed.) foll. § 12304.1, p. 292.)

As we have stated, section 12301.6, added in 1999, authorized the counties to establish public authorities to provide for the delivery of in-home supportive services (*id.*, subd. (a)(2)) and provided, among other things, that such public authority "shall be deemed to be the employer" of the provider for purposes of collective bargaining. (*Id.*, subd. (c)(1).) Section 12301.6 also makes clear in the same subdivision that "Recipients shall retain the right to hire, fire, and supervise the work of any in-home supportive services personnel providing services to them." (*Id.*, subd. (c)(1).)

In *Bonnette, supra,* 704 F.2d 1465, the Ninth Circuit recognized that in the counties involved in that litigation, "[t]he recipient was responsible for hiring

---

[17] We note the Historical and Statutory Notes to the 2010 amendment to section 12302.2, adding withholding of sales taxes to the DSS's obligations, state: "Section 32 of Stats. 2010, c. 725 (A.B.1612), provides: [¶] 'SEC. 32. Section[] . . . 22 . . . of this act *shall not be interpreted to alter the employer and employee relationship between any provider of in-home supportive services and any governmental agency,* except in regard to the collection and disbursement of funds required by this act.' " (Historical and Statutory Notes, 74A West's Ann. Welf. & Inst. Code, *supra,* foll. § 12302.2, p. 183, italics added.)

Although this note clarifies the intent of the Legislature in 2010 when it enacted section 22 amending section 12302.2, it does not appear to advance the argument of either party here, because the question is what was the nature of the employment relationship between providers and the governmental agencies in 2008 and early 2009, when Guerrero performed services.

[18] Formerly located in subdivision (b), this provision is currently located in subdivision (a) of section 12304.

and firing the chore worker" and "for the day-to-day supervision of the chore worker." (*Id.* at p. 1468.) Nothing in the legislative history of the amendments to the IHSS program provisions indicates any intention of the Legislature to overturn or supersede *Bonnette*'s holding that under the FLSA, the state and counties were joint employers with recipients of IHSS service providers. Rather, the language relied upon by real parties in interest confirms that no change in the recipients' then existing right to hire, fire and supervise providers was effected by the establishment of public authorities to administer the delivery of IHSS services.

*(2) Determine the rate and method of payment.* As was the case in *Bonnette, supra*, 704 F.2d 1465, the chore workers' wages were determined and paid by the state and its agents, County and Public Authority. (See *James v. Fenske* (D.Colo., Mar. 1, 2012, No. 10-cv-02591-WJM-CBS) 2012 U.S.Dist. Lexis 26632.)[19]

Although real parties in interest argue that providers were paid directly by the *state*, rather than by real parties in interest, it is undisputed that the state, County and Public Authority, in combination, determined the rate and method of payment. (See DSS Manual, § 30-764, "Individual Provider Compensation.") Public Authority was authorized by County, as allowed by state statute, to engage in collective bargaining with the provider's union over wage rates, subject to approval of the agreement by the state. (§ 12306.1, subd. (a).) Any increase in provider wages or benefits negotiated by Public Authority must be approved by both the Sonoma County Board of Supervisors and the state (*id.*, subd. (a)(1)), with the state paying 65 percent and the County 35 percent of the nonfederal share of wage and benefit increases negotiated by the Public Authority, with the state contribution capped at a maximum amount set by statute. (*Id.*, subds. (c), (d).) Further, in administering the IHSS program, County and Public Authority act as an agent of the state. (*In-Home Supportive Services v. WCAB, supra*, 152 Cal.App.3d 720, 731.)

■ Real parties in interest attempt to differentiate their role in determining and paying wages, as well as in keeping records, from that of the state, implying that real parties in interest are not joint employers with the recipient, even though the state may be. However, we agree with *In-Home Supportive*

---

[19] In *James v. Fenske, supra*, 2012 U.S.Dist. Lexis 26632, the district court denied summary judgment as to a claim under the FLSA against a county clerk and recorder in her official capacity where she had no power to hire, fire, or supervise plaintiff deputy sheriffs. The court found questions of fact were presented where evidence was submitted that the clerk and recorder analyzed and determined plaintiffs' individual wage amounts and where she had responded to a plaintiff's inquiry regarding wages in a memo stating that her office had conducted an audit and had concluded plaintiffs received an " 'annual' salary" and were " 'paid per FLSA at 86 hours per 14 day period.' " (2012 U.S.Dist. Lexis 26632 at p. *13.)

*Services v. WCAB, supra*, 152 Cal.App.3d 720, that in administering the IHSS program, counties act as agents of the state, rendering both the state and County employers of the IHSS provider. (*Id.* at p. 731.)[20] (It appears undisputed that Public Authority necessarily is an agent of County in administering the IHSS program.)

■ In *In-Home Supportive Services v. WCAB, supra*, 152 Cal.App.3d 720, the court held the IHSS provider was a *dual employee* of the IHSS recipient *and* the state for purposes of workers' compensation coverage. (*Id.* at pp. 725, 732.) The appellate court reasoned that "[t]he state supervises the county welfare departments (counties) which administer the program on the local level. [Citations.]" (*Id.* at p. 725.) "This scheme of engagement of individuals by the state, *through its agents* [(the county welfare departments)], to perform IHSS services for recipients required by state regulations establishes an employment relationship. The individual must do the chores listed in the county assessment of need. Payment for these services is provided by the state. The county, under the regulatory scheme, has the right to sufficient control over the IHSS provider to make the state chargeable, by virtue of the agency relationship with the state, as *an* employer." (*Id.* at p. 731, fn. omitted, some italics added.) In so holding, the court rejected the state's argument that the provider could not be an employee of the state where Labor Code section 3351.5, subdivision (b), stated that an IHSS worker was " '*an* employee of the recipient.' " (*In-Home Supportive Services v. WCAB*, at pp. 733–734.) The court recognized the *dual* employment relationship where the state, by virtue of the state's agency relationship with the county, was chargeable as *an* employer, as was the recipient. (*Id.* at pp. 732–734.)

*(3) Maintain employment records.* Both County and the state maintain employment records on the provider and the recipient. Real parties in interest concede County enters the provider's timesheet into a database maintained by the state. (DSS Manual, § 30-769.) The state issues the checks to the providers. County also "[*a*]*uthorize*[*s*] *the disbursement* of all funds paid . . . by: [¶] (1) [r]eviewing all time sheets prior to entry of time sheet data into the system to ensure consistency between hours reported and hours authorized

---

[20] Describing a program remarkably similar to that extant today, the Court of Appeal observed: "[T]he amount and nature of IHSS services required by the recipient is determined by the county welfare department. (See, e.g., Welf. & Inst. Code, § 12301.1.) County social services staff determine the types of services to be provided, the service delivery method, and the number of hours per service per week. (Regs. 30-461; current regs. [DSS Manual, §] 30-761.) These determinations are based on the recipient's physical and mental condition, living situation, and social situation. (*Ibid.*) Even if the payment for services is sent to the recipient, the county department retains the right to institute a different form of service delivery or provider payment, i.e. to divest the recipient of the right to hire and reduce it to a bare preference, if there is a substantial deviation from the county's assessment of need in use of the funds. (Regs. § 30-467.134; current [DSS Manual,] § 30-767.133.)" (*In-Home Supportive Services v. WCAB, supra*, 152 Cal.App.3d at p. 731.)

[and by] [¶] (2) [r]eviewing any significant discrepancies between hours reported and hours authorized to determine the reason and take corrective action as indicated." (DSS Manual, § 30-769.241(c), italics added.) The state maintains a database of pay records, issues IRS form W-2s to the provider and is responsible for a myriad of employer functions with respect to withholding, deductions, workers' compensation, and so forth on behalf of the recipient as the employer. (§§ 12301.6, 12302.2.) *County retains completed timesheets* (DSS Manual, § 30-769.24(d)) and is required to "[r]espond to and resolve payment inquiries from recipients and providers." (DSS Manual, § 30-769.24(e).) Should a provider have a grievance or complaint concerning processing or payment of money for personal services rendered, the grievance or complaint is submitted to and determined by County in the first stage of the process. (DSS Manual, § 30-767.6(a).)

Furthermore, currently County must perform additional "quality assurance activities," including fraud detection and prevention in administering the IHSS program. (§ 12305.71.) It must perform routine reviews of supportive case services to ensure there are accurate assessments of needs and hours; developing, with the state, policies, procedures, timelines, and instructions under which County will receive, resolve and respond appropriately to claims data match discrepancies or other information that indicates potential overpayments to providers or recipients or third party liability; monitoring the delivery of supportive services in the county to detect and prevent potential fraud by providers, recipients and others to maximize recovery of overpayments. (§ 12305.71, subds. (a), (b), (c).) Such monitoring may include unannounced home visits to a recipient's home to verify the receipt of services. (§ 12305.71, subd. (c)(3)(A), (B).)

Public Authority is required to investigate the qualifications and background of potential providers and to provide training for providers as well as recipients. (§ 12301.6, subd. (e)(2),(4).) Where Public Authority is notified that the prospective registry applicant has been convicted of certain criminal fraud offenses specified in the statutes, the Public Authority "shall deny the request to be placed on the registry for providing supportive services to any recipient of the [IHSS] program." (§ 12301.6, subd. (e)(2)(A)(ii); see subd. (e)(2)(A)(iii).)

In sum, this factor militates strongly toward the existence of an employment relationship between real parties in interest and the provider.

*(4) Supervision and control over employee work schedules or conditions of employment.* The key role played by County in "supervising" the provision of services by IHSS providers to recipients is inherent in the structure of the program and in the standards governing the delivery of services set forth in

the DSS Manual. With regard to individual provider compensation, the DSS Manual states: "Social service staff shall determine the amount of the IHSS payment required to purchase services to meet the IHSS adjusted need . . . ." (DSS Manual, § 30-764.11.) Further, "[t]he hours and amount of compensation available for personal attendant providers shall be determined by county social services staff. The payment shall be the minimum necessary to obtain adequate service to meet the authorized service needs of the recipient." (DSS Manual, § 30-764.13.) In addition, "[t]he recipient shall develop a work schedule which is consistent with the authorized service hours at the county's base rate. If the recipient finds that a work schedule cannot be established without requiring payment in excess of the county's base rate, the recipient shall bring such information to the county's attention. *The county will determine if payment in excess of the base rate is necessary*. Any additional costs resulting from the recipient's actions in work scheduling or increasing the rate paid per work unit shall be borne by the recipient unless prior county approval has been obtained." (DSS Manual, § 30-764.23, italics added.) The DSS Manual also states that "[a]s employers[,] recipients have certain responsibilities for standards of compensation, work scheduling and working conditions as they apply to IHSS individual providers. *The county will assure that all recipients understand their basic responsibilities as employers.*" (DSS Manual, § 30-764.31, italics added.)

Real parties in interest argue that although the DSS Manual "contains numerous, and quite specific, conditions for a recipient to receive services and classifications of the type of services a recipient may be entitled to, it does not control *when* and *how* provider actually works for the recipient." (Italics added.) Nevertheless, it is undisputed that County is responsible for: "(1) Authorizing services for an IHSS recipient; [¶] (2) Determining a recipient's need for IHSS, the level and quality of services required, and the eligibility of individuals to be served; [¶] (3) Conducting the initial or any subsequent assessment of need for services; [and] [¶] (4) Terminating the recipient's participation in the IHSS program." (Sonoma County Mun. Code, § 2-363, subd. (d); see § 12301.1) Although real parties in interest accurately point out that the provider may work at whatever tasks the recipient assigns and for whatever length of time the two agree, *the provider will only be paid under the IHSS program* for those hours and services authorized by the County. (See § 12300, subd. (h)(3) [cap on maximum number of hours]; DSS Manual, § 30-764.23 [requiring prior approval by County for payment in excess of the base rate and providing that "additional costs resulting from the recipient's actions in work scheduling or increasing the rate paid per work unit shall be borne by the recipient unless prior county approval has been obtained."].)

These aspects of the relationship between recipient and provider are no different than when *Bonnette* was decided. As was the case then, the

recipients are responsible for the day-to-day supervision of the providers. However, today, real parties in interest perform additional "quality assurance activities," monitoring the delivery of supportive services to detect and prevent potential fraud by providers, recipients and others. Such monitoring activities even include the authority to conduct home visits. (§ 12305.71.) Moreover, the County has authority to grant exceptions to the hourly task guidelines where circumstances require (DSS Manual, § 30-757) and is tasked with assisting providers and recipients with problems or complaints regarding payment.

Here, the "economic reality" is, as was the case in *Bonnette, supra,* 704 F.2d 1465, that real parties in interest and the state exercise "considerable control over the structure and conditions of employment by making the final determination, after consultation with the recipient, of the number of hours each chore worker would work and exactly what tasks would be performed" in order to receive payment authorized under the IHSS program. (*Id.* at p. 1470.)

Our conclusion, that not only the recipient but also real parties in interest may be joint employers of the IHSS service provider under the FLSA, finds further support in the actions of the Legislature, taken shortly after the period during which Guerrero alleges she performed IHSS services for Buenrostro.

In 2009, the Legislature required that, effective November 1, 2009, "all prospective providers must complete a provider orientation at the time of enrollment, as developed by the [D]epartment, in consultation with counties . . . ." (§ 12301.24, subd. (a).) The orientation must include, but is not limited to: "[t]he requirements to be an eligible IHSS provider," "a description of the IHSS program," a description of program "rules, regulations, and provider-related processes and procedures, including timesheets," "[t]he consequences of committing fraud," "[t]he Medi-Cal toll-free telephone fraud hotline and Internet Web site for reporting suspected fraud or abuse in the provision or receipt of supportive services." (*Id.,* subd. (a)(1)–(5).) To complete provider enrollment, at the conclusion of the provider orientation, all applicants must sign a statement agreeing that he or she will provide authorized services to a recipient, understands timesheet requirements, will "cooperate with state or county staff to provide any information necessary for assessment or evaluation of a case," "understands and agrees to program expectations and is aware of the measures that the state or county may take to enforce program integrity," "has attended the provider orientation and understands that failure to comply with program rules and requirements may result in the provider being terminated from providing services through the IHSS program." (§ 12301.24, subd. (b)(1)–(5).) The county is required to "indefinitely retain this statement in the provider's file" and a "[r]efusal of the

provider to sign the statement . . . shall result in the provider being ineligible to receive payment for the provision of services and participate as a provider in the IHSS program." (§ 12301.24, subd. (d).)

## B. *Moreau v. Air France*

Real parties in interest contend the facts here are analogous to those in *Moreau v. Air France* (9th Cir. 2003) 356 F.3d 942 (*Moreau*), arising under the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601 et seq.) (FMLA) and its California counterpart, the California Moore-Brown-Roberti Family Rights Act. (Gov. Code, § 12945.2.) (*Moreau*, at p. 944.) In *Moreau*, the Ninth Circuit affirmed a grant of summary judgment in favor of Air France, finding the airline was not a joint employer of service workers hired by outside entities with which Air France contracted for performance of ramp and towing services, cargo and baggage handling and food preparation. (*Id.* at p. 953.) In the absence of reported cases addressing joint employment in the FMLA context, the court applied the joint employer analysis developed in FLSA cases, recognizing that the joint employment determination required consideration of the total employment situation, but focusing primarily on the four factors it had applied in *Bonnette, supra*, 704 F.2d 1465 (*Moreau*, at pp. 946–947) and a nonexhaustive list of additional factors relevant to the "economic reality" of the alleged joint relationship considered in *Torres-Lopez v. May* (9th Cir. 1997) 111 F.3d 633 (*Torres-Lopez*) that led *Torres-Lopez* to conclude that the grower should be considered a joint employer with the labor contractor of farmworkers.[21] (*Moreau*, at pp. 947, 950–952.)

---

[21] *Moreau* described the "non-exhaustive list of factors set forth in the AWPA [(the Migrant and Seasonal Agricultural Worker Protection Act)]" considered by *Torres-Lopez* in reaching its conclusion "that the grower should be considered a joint employer with the labor contractor, because the grower exercised considerable control over the farmworkers and the farmworkers were 'economically dependent' on the grower for their work. [(*Torres-Lopez, supra*, 111 F.3d] at p. 644.)]" (*Moreau, supra*, 356 F.3d at p. 948.) These included:

"(A) The nature and degree of control of the workers;

"(B) The degree of supervision, direct or indirect, of the work;

"(C) The power to determine the pay rates of the methods of payment of the workers;

"(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and

"(E) Preparation of payroll and the payment of wages.

"29 C.F.R. § 500.20(h)(4)(ii)." (*Moreau, supra*, 356 F.3d at p. 947.)

Additional "non-regulatory" factors listed by *Moreau* as having been identified by *Torres-Lopez* as possibly relevant to joint employer analysis included:

"(1) whether the work was a specialty job on the production line;

"(2) whether responsibility under the contracts between a labor contractor and an employer pass from one labor contractor to another without material changes;

"(3) whether the premises and equipment of the employer are used for the work;

"(4) whether the employees had a business organization that could or did shift as a unit from one worksite to another;

*Moreau* first considered "the *Bonnette* factors, which roughly correspond to the *Torres-Lopez* 'regulatory factors.' [Citations.]" (*Moreau*, 356 F.3d at p. 950.) It found none pointed toward joint employment. "Air France lacked the ability to hire or fire ground handling company employees, it did not determine the rate or method of pay for these employees, and it did not keep employment records for these employees. It did not set or control the employees' work schedules, working conditions, or establish conditions upon which the employees would receive payment." (*Ibid.*, fn. omitted.) It is immediately apparent that at least two critical factors present in this case— real parties in interest's determination of the rate and method of pay for providers and its participation with the state in generating and retaining employment records and timesheets—were not present in *Moreau*.

Further, *Moreau* recognized that Air France's specification of how it wanted its work performed, and its checking to ensure its standards were met, could "in some situations, constitute 'indirect' supervision of the employees' performance. [Citation.]" (*Moreau, supra*, 356 F.3d at p. 951, citing *Torres-Lopez*, 111 F.3d at pp. 642–643.) However, because much of the indirect supervision or control exercised by Air France was to ensure compliance with various safety and security regulations, the court concluded it was "qualitatively different from the farmworker situation in *Torres-Lopez*." (*Moreau*, at p. 951.) *Moreau* also observed that Air France's actions in specifying the work to be performed and following up to ensure adequate performance could constitute some control over the work or working conditions of the employee, but concluded that viewed in context, such supervision and control was minimal in contrast to *"numerous other factors"* that negate a finding of joint employment relationship.[22] (*Moreau*, at p. 951, italics added.) Here, many of the other factors support the finding of a joint employment relationship.

"(5) whether the work was piecework and not work that required initiative, judgment or foresight;

"(6) whether the employee had an opportunity for profit or loss depending upon the alleged employee's managerial skill;

"(7) whether there was permanence in the working relationship; and

"(8) whether the service rendered is an integral part of the alleged employer's business. [Citation.]" (*Moreau, supra*, 356 F.3d at pp. 947–948.)

[22] In addition to Air France's lack of control over the rate and method of pay and its lack of involvement in keeping employment records, the *Moreau* court identified factors supporting the finding of no joint employment relationship. These included the existence of negotiated service contracts with the ground contractors that could not simply be passed on to other contractors; the service work was primarily performed on the premises of the ground handling companies or the tarmac; the investment of significant capital in expensive equipment by the ground contractors; unlike the farmworkers, the ground handling employees had a business organization that could and did shift as a unit from one carrier to another; all the contractors served multiple carriers, as did many of the individual workers; in contrast to the farm

Finally, *Moreau, supra,* 356 F.3d 942, arose from the district court's grant of summary judgment. On appeal, the Ninth Circuit recognized that the appeal was "necessarily fact-specific" (*id.* at p. 944), while also recognizing that the question whether Air France was a joint employer was a legal question. (*Id.* at p. 945.) The instant case arises from the sustaining of a demurrer. Although the IHSS program and the roles of the state and real parties in interest are set forth in detail by statute, ordinance, and administrative standards, nevertheless, many of the "facts" regarding the particular IHSS services authorized for Buenrostro and the specific tasks performed by Guerrero are unknown at this stage of the proceeding.

### IV. FLSA's Domestic Services Companionship Services Exemption

As an alternative and independent basis for granting the demurrer to Guerrero's FLSA cause of action, the superior court also concluded that Guerrero's job was exempt from FLSA provisions related to minimum wage and maximum hour protections, pursuant to the domestic service "companionship" exception of title 29 United States Code section 213. Guerrero maintains that she does not come within the exception, as she alleged that while providing IHSS services to Buenrostro, she "performed general household work exceeding twenty percent of her total weekly hours worked." We agree with Guerrero that the trial court erred in sustaining the demurrer on this alternative basis where there existed factual questions as to what activities constituted the "general household work" she alleged she performed and whether such work exceeded 20 percent of her total weekly hours worked.

As described by the United States Supreme Court in *Long Island Care at Home, Ltd. v. Coke* (2007) 551 U.S. 158, 162 [168 L.Ed.2d 54, 127 S.Ct. 2339]: "In 1974, Congress amended the Fair Labor Standards Act of 1938 (FLSA or Act), 52 Stat. 1060, to include many 'domestic service' employees not previously subject to its minimum wage and maximum hour requirements. See Fair Labor Standards Amendments of 1974 (1974 Amendments), §§ 7(b)(1), (2), 88 Stat. 62 (adding 29 U.S.C. § 206(f), which provides for a minimum wage for domestic service employees, and § 207(*l*), which extends overtime restrictions to domestic service employees). When doing so, Congress simultaneously created an exemption that *excluded* from FLSA coverage certain subsets of employees 'employed in domestic service employment,' including babysitters 'employed on a casual basis' and . . .

laborers, ground handling employees had an opportunity for profit or promotion based on their managerial skill; neither the ground contractors nor the ground handling employees were economically dependent on Air France. (*Moreau, supra,* 356 F.3d at pp. 951–953.) To the extent these factors are relevant to the economic relationship in the present case, most would seem to cut in favor of finding a joint employment relationship.

companionship workers described [in 29 United States Code section 213(a)(15)]. § 7(b)(3), 88 Stat. 62 (codified at 29 U.S.C. § 213(a)(15))."

Title 29 United States Code section 213(a) states that the minimum wage and overtime provisions of the FLSA "shall not apply with respect to— [¶] . . . [¶] (15) any employee employed on a casual basis in domestic service employment to provide babysitting services or *any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves* (as such terms are defined and delimited by regulations of the Secretary)." (29 U.S.C. § 213, italics added.)

In turn, regulations promulgated by the federal Department of Labor define "*domestic service employment*" covered by FLSA minimum wage and overtime provisions as "services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed. The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use. It also includes babysitters employed on other than a casual basis. This listing is illustrative and not exhaustive." (29 C.F.R. § 552.3 (2012).) The Department of Labor defines exempted "*companionship services*" as, "those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. *They may also include the performance of general household work: Provided, however, [t]hat such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. . . .*" (29 C.F.R. § 552.6, some italics added.)

■ FLSA "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." (*Arnold v. Ben Kanowsky, Inc.* (1960) 361 U.S. 388, 392 [4 L.Ed.2d 393, 80 S.Ct. 453]; accord, *Corning Glass Works v. Brennan* (1974) 417 U.S. 188, 196–97 [41 L.Ed.2d 1, 94 S.Ct. 2223] [reiterating the "general rule that the application of an exemption under the [FLSA] is a matter of affirmative defense on which the employer has the burden of proof"]; see *Meacham v. Knolls Atomic Power Laboratory* (2008) 554 U.S. 84, 85 [171 L.Ed.2d 283, 128 S.Ct. 2395] ["[t]he Court has given this principle particular weight in enforcing the [FLSA] . . . ."]; *Nordquist v. McGraw-Hill Broadcasting Co.* (1995) 32 Cal.App.4th 555, 562 [38 Cal.Rptr.2d 221].)

■ The FLSA companionship exemption distinguishes household work related to the care of the recipient, which includes meal preparation, bed making, laundry, and other similar services, from general household work that is unrelated to the care of the recipient. (29 C.F.R. § 552.6 (2012).) In *McCune v. Oregon Senior Services Division* (9th Cir. 1990) 894 F.2d 1107 (*McCune*), the court recognized that under the federal regulation "any household work *related* to the care of the individual would not be counted towards the twenty percent threshold." (*Id.* at p. 1111.) The district court whose grant of summary judgment was affirmed by the Ninth Circuit illustrated this distinction: "Dusting or cleaning [the client's bedroom or living room] appears to be routine, general household work, rather than work related to the individual. Cleaning a spill by the client in either room, by contrast, would be non-routine care more related to the individual than to the general household, and would not be included in the twenty percent figure. [¶] The regulation defines care related to the individual as including meal preparation, bed making, washing of clothes, and 'other similar services.' These similar services would presumably include other types of personal care, such as bathing, feeding, or cleaning spills." (*McCune v. Oregon Senior Services Division* (D.Or. 1986) 643 F.Supp. 1444, 1450, affd. (9th Cir. 1990) 894 F.2d 1107.)

It has been observed that, "The inquiry into whether an employee's household work is related to the care of the individual is one of the most confused aspects of the jurisprudence regarding home healthcare workers." (Biklen, *Healthcare in the Home: Reexamining the Companionship Services Exemption to the Fair Labor Standards Act* (2003) 35 Colum. Hum. Rts. L.Rev. 113, 142.) "Determining whether or not all of the elements of the exemption have been established is a *fact-intensive inquiry.* The appropriateness of any employee's classification as exempt must be based on a review of the actual job duties performed by that employee." (*United Parcel Service Wage & Hour Cases* (2010) 190 Cal.App.4th 1001, 1014–1015 [118 Cal.Rptr.3d 834], italics added [discussing Cal. wage and hour regulations, but also citing 29 C.F.R. § 541.2 (2012) ["A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations . . . ."].)

We cannot resolve the factual issue whether the services performed by Guerrero that she alleged exceeded the 20 percent limit constituted "general household work" related to the household rather than to the individual recipient. The court did not sustain the demurrer on the ground that Guerrero had not specified the exact tasks that she alleged constituted the "general household work" that brought her within the exception to the companionship exemption. Real parties in interest neither argue nor provide authority that

Guerrero's complaint must allege the precise tasks she performed to state a cause of action under FLSA. It may be that upon summary judgment or at trial, evidence of the actual services performed by Guerrero will establish that the 20 percent exception from the domestic services companionship exemption does not apply to her. Whether the particular IHSS services authorized by County for Buenrostro and that Guerrero alleges she performed fell within the companionship exemption of the FLSA or the exception to that exemption present questions of fact in this case. The court erred in making that factual determination on demurrer.[23]

## V. Policy Concern of Amicus Curiae and Real Parties in Interest

The core concern underlying the arguments of respondent and amicus curiae California State Association of Counties that only the recipient and not real parties in interest can control the hiring, firing, or supervision of providers, is that the IHSS funding scheme provides no resources for assuming liability for conduct of recipients in failing to pay providers wages due for the work providers have performed for them. Real parties in interest contend that interpreting the IHSS statutes to make them liable for wage and hour claims would require real parties in interest to "pay overtime on demand, without (1) a means of preventing the liability from occurring; or (2) a means of recouping that liability from the State, which funds the wages of the providers." Such "would lead to an absurd result—the County and the Public Authority being liable for wages that they have no power to control." It cannot be the case that the state or real parties in interest are required to pay for services not covered by the IHSS program or exceeding the hour limits of the recipient's authorization *merely* because the services are performed for a recipient qualified and authorized to receive IHSS services, if real parties in interest neither know nor have a realistic ability to obtain knowledge that a provider is working overtime or is providing services other than those covered by the IHSS program, so that real parties in interest could exercise their ability to prevent fraud, by requiring the recipient to comply with IHSS regulations in order to continue to receive IHSS services or face

---

[23] We note real parties in interest's contention that *all* household work performed by Guerrero under the IHSS program was *related to* the care of the individual recipient. They argue that Guerrero's job as an IHSS provider necessarily fits within the companionship exemption and that any general household work unrelated to Buenrostro would be outside the scope of Guerrero's employment in the IHSS program, and cannot be counted toward the 20 percent exception. This reasoning seems to us tautological, relying as it does upon the protean term "related to." Although all services under the IHSS program are "related to" the recipient in broad terms, in that they are all aimed at assisting the recipient to remain safely in his or her home, the myriad types of services covered by the program extend far beyond those covered by the narrow companionship exemption described by federal regulations and recognized by the cases.

sanctions, including termination from the program. We disagree with the premise that real parties in interest lack any control over the provision of IHSS services by providers.

In *McCune, supra,* 894 F.2d 1107, the Ninth Circuit addressed a similar issue under the FLSA. *McCune* held the district court had properly determined that providers must be compensated for "all hours that the state suffers or permits to be worked. [Citations.]" (*Id.* at p. 1111.) However, providers did not seek and were not entitled to overtime pay. As the Ninth Circuit reasoned, "knowledge of the hours [providers] worked would be imputed from state caseworkers to the state agencies under a general agency theory." (*Ibid.*) Both the state and recipients were joint employers based upon *Bonnette, supra,* 704 F.2d 1465. However, the *recipient's knowledge of the hours worked by the provider was not imputed to the state.* According to *McCune,* "[t]he disabled individuals are the recipients of the state and federal aid under this program. Allowing them to control the hours worked and then forcing the state to pay for the services performed would remove much of the control of the program from the state agencies charged with its administration. This would not be appropriate." (*McCune,* at pp. 1111–1112.)

The IHSS program pays for specified services delivered to qualified recipients up to a maximum number of hours. Where a qualified provider delivers services *other* than those authorized and covered by the program or for a greater number of hours than authorized *and* real parties in interest have *no knowledge* that such is occurring and are realistically unable to inform themselves of such, we agree it would be inappropriate to impute the recipient's knowledge to real parties in interest so as to require real parties in interest to pay for such services. (See *McCune, supra,* 894 F.2d at pp. 1111–1112.)

However, real parties in interest's actual knowledge of and their ability to inform themselves about a recipient's abuse of the IHSS program task and hour requirements with regard to a particular provider presents questions of fact. Here, it is unknown what, if anything, real parties in interest knew or had the ability to know about the IHSS services Guerrero alleges she rendered to recipient. These are questions for the trier of fact on remand.

Enactment in 2009 of requirements for prospective provider orientation and provider enrollment should assist providers in learning about program requirements and their rights under the program and should enable them to promptly report violations by recipients, should such occur. In such cases, prompt reporting by providers would likely impact factual determinations whether the state, counties or public authorities, through their representatives and agents, knew or had the ability to know that unauthorized services or wage and hour violations were occurring.

## VI. Whether Real Parties in Interest Were Guerrero's Employers Under the Labor Code

The trial court sustained the demurrer to Guerrero's causes of action for violation of California state minimum wage and overtime provisions. (§ 12301.6, subd. (c)(1); Lab. Code, §§ 1182.12, 1194, 1194.2, 1197; Cal. Code Regs., tit. 8, § 11150 et seq.) Real parties in interest again argue the court correctly determined that County and Public Authority were not Guerrero's joint employers for purposes of California wage and hour claims.

■ It is well established that states may adopt wage and hour laws that are *more protective* of workers than the FLSA, and California has done so. (See *Martinez v. Combs* (2010) 49 Cal.4th 35, 64 [109 Cal.Rptr.3d 514, 231 P.3d 259] (*Martinez*); *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795 [85 Cal.Rptr.2d 844, 978 P.2d 2].) Although real parties in interest have not expressly so argued, we reject at the outset any implication that a determination that real parties in interest are joint employers of providers of IHSS services under the FLSA could be overridden by a determination that real parties in interest are *not* employers under state wage and hour laws. (Cf. *White v. Davis* (2003) 30 Cal.4th 528, 545, fn. 7 [133 Cal.Rptr.2d 648, 68 P.3d 74] ["state remains obligated to comply with the provisions of the FLSA"].)

Real parties in interest rely in large measure upon the California Supreme Court's opinion in *Martinez, supra,* 49 Cal.4th 35, in which the court affirmed the grant of summary judgment against seasonal agricultural workers seeking to recover unpaid minimum wages from two produce merchants and the field representative of one of the merchants, following the insolvency of the farmer who employed the workers during the strawberry season. (*Id.* at p. 42.) Addressing the uncertainty of the definition of the "employment relationship" in state wage and hour actions under Labor Code section 1194, the Supreme Court agreed with the plaintiff-workers that "the Legislature intended the IWC's wage orders to define the employment relationship in actions under the statute." (*Martinez,* at p. 52.)[24]

■ *Martinez* rejected the defendants' contention that the narrower federal standard governed the definition of employer and refused "to define employment exclusively according to the common law in civil actions," as such

---

[24] "The statute [(Lab. Code, § 1194)] provides in relevant part as follows: 'Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit.' (*Id.,* subd. (a).) The Legislature has thus given an employee a cause of action for unpaid minimum wages without specifying who is liable. That only an employer can be liable, however, seems logically inevitable as no generally applicable rule of law imposes on anyone other than an employer a duty to pay wages." (*Martinez, supra,* 49 Cal.4th 35 at p. 49.)

would render the IWC's definitions "effectively meaningless." (*Martinez, supra,* 49 Cal.4th at p. 65.) "Courts must give the IWC's wage orders independent effect in order to protect the commission's delegated authority to enforce the state's wage laws and, as appropriate, *to provide greater protection to workers than federal law affords.* [Citations.]" (*Id.* at p. 68, italics added.)

Although agreeing with the plaintiff-workers that "the Legislature intended the IWC's wage orders to define the employment relationship in actions under the statute" (*Martinez, supra,* 49 Cal.4th 35 at p. 52), the Supreme Court ultimately agreed with the defendants that they were neither the plaintiffs' employers nor joint employers with the farmer under the definitions of "employ" and "employer" set forth in all 16 of the IWC's industry and occupation orders. (*Id.* at p. 59.)[25] Those industry and occupation orders, including IWC wage order No. 15-2001, the one applicable to "household occupations" at issue here, define the terms as follows:

"(E) 'Employ' means to engage, suffer, or permit to work.

"(F) 'Employee' means any person employed by an employer.

"(G) 'Employer' means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (IWC Wage order No. 15-2001, "Order Regulating Wages, Hours, and Working Conditions in Household Occupations" (Cal. Code Regs., tit. 8, § 11150, subd. 2).)[26]

■ In speaking about the IWC's definition of "employer," the Supreme Court stated in *Martinez, supra,* 49 Cal.4th 35: "Beginning with the word

---

[25] "Today 18 wage orders are in effect, 16 covering specific industries and occupations, one covering all employees not covered by an industry or occupation order, and a general minimum wage order amending all others to conform to the amount of the minimum wage currently set by statute." (*Martinez, supra,* 49 Cal.4th at p. 57, fns. omitted.)

[26] IWC wage order No. 15-2001, applicable here, provides in relevant part:

"1. Applicability of Order[.] This order shall apply to all persons employed in household occupations . . . *except that:* [¶] . . . [¶]

"(B) Except as provided in sections 1, 2, 4, 10, and 15, the provisions of this Order shall not apply to personal attendants. . . . [¶] . . . [¶]

"2. Definitions[.] [¶] . . . [¶]

"(E) 'Employ' means to engage, suffer, or permit to work.

"(F) 'Employee' means any person employed by an employer.

"(G) 'Employer' means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person.

"(H) 'Hours worked' means the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so.

'employs,' the definition logically incorporates the separate definition of 'employ' (i.e., 'to engage, suffer, or permit to work') as one alternative. The remainder of the definition—'exercises control over . . . wages, hours, or working conditions'—has no clearly identified, precisely literal statutory or common law antecedent." (*Id.* at p. 59.) However, the court made several observations about the language, recognizing that "phrased as it is in the alternative (i.e., 'wages, hours, *or* working conditions'), the language of the IWC's 'employer' definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work." (*Ibid.*, fn. omitted.)

■ Further, as *Martinez, supra,* 49 Cal.4th 35, explained, "IWC's 'employer' definition belongs to a set of revisions intended to distinguish state wage law from its federal analogue, the FLSA. We touched upon this point in *Morillion v. Royal Packing Co.* [(2000)] 22 Cal.4th 575 [94 Cal.Rptr.2d 3, 995 P.2d 139]. In 1947, Congress limited the FLSA by enacting the Portal-to-Portal Act of 1947 (29 U.S.C. § 252 et seq.), which relieved employers of the obligation to compensate employees for time spent travelling to the worksite, even in an employer's vehicle, and for time spent in activities 'preliminary to or postliminary' to work (*id.*, § 254(a)(2)). In response, the IWC, exercising its authority to provide employees with greater protection than federal law affords (*Morillion v. Royal Packing Co., supra,* at p. 592; see also *Ramirez v. Yosemite Water Co.*[, *supra,*] 20 Cal.4th 785, 795 . . .), revised its wage orders from 1947 forward to define the term 'hours worked' as meaning 'the time during which an employee is *subject to the control of an employer,* . . . includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so.' At the same time, the IWC defined 'employer' as meaning 'any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of [an employee].' " (*Martinez,* at pp. 59–60, fn.

"(I) 'Household Occupations' means all services related to the care of persons or maintenance of a private household or its premises by an employee of a private householder. Said occupations shall include[,] but not be limited to[,] the following: butlers, chauffeurs, companions, cooks, day workers, gardeners, graduate nurses, grooms, house cleaners, housekeepers, maids, practical nurses, tutors, valets, and other similar occupations.

"(J) 'Personal attendant' includes baby sitters and means any person employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child or person who by reason of advanced age, physical disability, or mental deficiency needs supervision. The status of 'personal attendant' shall apply when no significant amount of work other than the foregoing is required." (The Division of Labor Standards Enforcement (DLSE) has issued a formal opinion letter equating "significant amount" with the 20 percent threshold provided in the federal regulation. (Dept. of Industrial Relations, DLSE Opn. Letter No. 2005.11.23 (Nov. 23, 2005) p. 2, fn. 3; see p. 956, *post*).)

and italics omitted.) *Martinez* concluded that "[t]o employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours *or* working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id.* at p. 64, italics added.)

Applying its analysis of the terms "employ" and "employer" to the agriculture worker case before it, the Supreme Court refused "to define employment exclusively according to the common law in civil actions," as such would render the IWC's definitions "effectively meaningless." (*Martinez, supra,* 49 Cal.4th at p. 65.) The court also reiterated its caution against " 'confounding federal and state labor law' (*Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, 798) and explained 'that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations or interpretations to construe state regulations is misplaced' [citations]. Courts must give the IWC's wage orders independent effect in order to protect the commission's delegated authority to enforce the state's wage laws and, as appropriate, *to provide greater protection to workers than federal law affords.* [Citations.]" (*Martinez,* at p. 68, fn. omitted & italics added.)

The *Martinez* court rejected the plaintiffs' proffered suggestion that the defendants "suffered or permitted plaintiffs to work because defendants knew plaintiffs were working, and because plaintiffs' work benefited defendants." (*Martinez, supra,* 49 Cal.4th at p. 69.) Rather, the court explained, "the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring. [Citations.] Here, neither [of the produce merchants] suffered or permitted plaintiffs to work because neither had the power to prevent plaintiffs from working. Munoz[, the farmer,] and his foremen had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work. Perhaps [the produce merchants], by ceasing to buy strawberries, might as a practical matter have forced Munoz to lay off workers or to divert their labor to other projects . . . . But any substantial purchaser of commodities might force similar choices on a supplier by withdrawing its business. Such a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's workforce." (*Id.* at p. 70.)

In rejecting the plaintiffs' argument that one of the produce merchants dominated the business financially and thus exercised indirect control over the plaintiffs' wages and hours, the court relied upon undisputed facts that Munoz grew and harvested strawberries for several unrelated merchants and had substantial revenue from sources other than the defendant produce merchants. (*Martinez, supra,* 49 Cal.4th at p. 72.) "Finally, Munoz alone,

with the assistance of his foremen, hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay (hourly or piece rate), and set their hours, telling them when and where to report to work and when to take breaks. Plaintiffs' claim that [the produce merchant] dominated Munoz's financial affairs cannot be reconciled with these facts." (*Ibid.*)

Real parties in interest argue that, as was true in *Martinez, supra,* 49 Cal.4th 35, they neither suffered nor permitted Guerrero to work because they had no power to *prevent* her from working and were prohibited from interfering with Buenrostro's ability to hire, fire and supervise her. However, several critical differences distinguish the case before us from *Martinez.*

Here, County or Public Authority, or both, determined Buenrostro's eligibility and need for services under the IHSS program, *authorized* Buenrostro to hire a household worker, determined the specific tasks that the household worker would perform and for which the IHSS program would pay—that is, the level and quality of services for which Buenrostro qualified and that provider could render under the program; determined how the provider would be paid—whether directly, as real parties in interest determined here—or through payment to the recipient, who would then pay the worker. County is responsible for documenting the hours worked. County enters the provider's timesheet into a database maintained by the state, cooperates with the state in terms of recordkeeping to facilitate payment to the provider, and changes data as necessary to assure correct payment to the correct individual. (DSS Manual, § 30-769.241.) Although the state issues the checks to the provider, County "[a]uthorize[s] the disbursement of all funds paid . . . by: (1) [r]eviewing all time sheets prior to entry of time sheet data into the system to ensure consistency between hours reported and hours authorized [and by] [¶] (2) [r]eviewing any significant discrepancies between hours reported and hours authorized to determine the reason and take corrective action as indicated." (DSS Manual, § 30-769.241(c).) County must respond to and resolve payment inquiries by both respondents and providers. (DSS Manual, § 30-769.241(e).)

Public Authority, as established and authorized by County, served as the "employer" for purposes of collective bargaining and as such determined the provider's rate of pay for IHSS services performed. Further, County could effectively terminate the provider by "[t]erminating the recipient's participation in the IHSS program." (Sonoma County Mun. Code, § 2-363, subd. (d).) We conclude the above demonstrates that real parties in interest exercised effective control over the wages of providers in numerous ways.

Public Authority is charged with establishing a registry to provide assistance to recipients in finding providers; investigating the qualifications and

background of potential providers; establishing a referral system under which providers are referred to recipients; providing for training for providers and recipients; and performing any other functions related to the delivery of in-home supportive services. (§ 12301.6, subds. (a)–(c); Sonoma County Mun. Code, § 2-363, subds. (a)–(c).) As Public Authority is tasked with establishing a provider registry and referral system to assist recipients and investigating qualifications and backgrounds of potential providers and County "[a]uthorize[s] the disbursement of all funds paid" by "[r]eviewing all time sheets prior to entry of time sheet data into the system" (DSS Manual, § 30-769.241(c)), it is likely real parties in interest know or should know that a particular provider is providing IHSS services authorized to a program recipient. Although recipients may elect to receive services from providers who are *not* referred to them by Public Authority or listed on the registry, the requirement that such providers must be referred to Public Authority "for the purposes of wages, benefits, and other terms and conditions of employment" (§ 12301.6, subd. (h)) further supports the conclusion that in the normal course of events, real parties in interest should know that particular providers are rendering services to recipients under the program.

Furthermore, while they do not directly hire, fire or supervise providers, through their "power of the purse" and quality control authority, real parties in interest have the ability to prevent recipients and providers from abusing IHSS authorizations both as to the type of services performed and the hours worked. Real parties in interest exercise effective control over the eligibility determination and the authorization of particular services for recipients. They can investigate instances of suspected fraud or abuse of the program and can terminate payments where fraud is demonstrated.

Nor do we find real parties in interest's reliance upon the analysis of *SEIU, supra,* 225 Cal.App.3d 761, persuasive. In *SEIU* the union petitioned for a writ of mandate requiring the County of Los Angeles to meet and confer with them as representatives of home care workers under the IHSS program. The appellate court majority, over a strong dissent by Justice Johnson, held that substantial evidence (including the factors relied upon by real parties in interest here) supported the trial court's finding that IHSS workers were *not* employees of the county under the MMBA that obligated the local government to bargain with representatives of county employees. (225 Cal.App.3d at p. 773.) The appellate court treated the issue as one of *fact,* upon which *conflicting evidence* had been presented and therefore concluded that substantial evidence supported the trial court's finding that IHSS providers under the "independent provider mode of delivery of service" (direct payment to a recipient to employ an individual provider to provide authorized services) were not employees of the county within the meaning of the MMBA. (225 Cal.App.3d at pp. 765–767.)

In finding substantial evidence supporting the trial court, the appellate court refused to follow either *Bonnette, supra*, 704 F.2d 1465 (holding that the state and counties, as well as recipients, were joint employers of IHSS providers for the purpose of the FLSA) or *In-Home Supportive Services v. WCAB, supra*, 152 Cal.App.3d 720, 731 (holding for purposes of workers' compensation law (Lab. Code, § 3200 et seq.) that the county, as an agent of the state, has the right to exercise control over IHSS providers and that as a consequence, providers are employed by the state as well as the recipient and are eligible for benefits for injuries sustained in the course and scope of employment.) It found them of "doubtful application in the present action, inasmuch as they determined that an IHSS provider is an employee of the state, or the county and the state, for purposes other than the MMBA." (*SEIU, supra*, 225 Cal.App.3d at p. 768.) The *SEIU* court also disagreed with an opinion of the California Attorney General that concluded IHSS providers may be considered county employees for purposes of collective bargaining (68 Ops.Cal.Atty.Gen. 194, 199–200 (1985) ["counties control the rate and method of payment, determine the amount and nature of the services required by the recipient, and are significantly involved in supervising the worker's job performance"]) and refused to follow it. (*SEIU, supra*, 225 Cal.App.3d at p. 768.)

By its own terms, *SEIU, supra*, 225 Cal.App.3d 761, is inapplicable here where the issue is *not* one of substantial evidence in the face of conflicting facts, but where the court held *as a matter of law* that real parties in interest were not joint employers of providers for purposes of federal and state wage and hour laws. *SEIU* also confined its analysis to the issue of employment under the MMBA, explicitly distinguishing *Bonnette, supra*, 704 F.2d 1465, as a federal wage and hour case. (*SEIU*, at p. 768.) Furthermore, in 1992, the California Legislature adopted section 12301.6, subdivision (c), providing that "[a]ny public authority created pursuant to this section shall be deemed to be the employer of in-home supportive services personnel referred to recipients . . ." within the meaning of the MMBA. (§ 12301.6, subd. (c)(1).) In so doing, it effectively overturned the holding of *SEIU, supra*, 225 Cal.App.3d 761, that counties were not employers of providers for purposes of collective bargaining.

. We conclude the trial court erred in determining as a matter of law that real parties in interest were not employers of IHSS providers for purposes of IWC wage order No. 15-2001.

## VII. Whether Real Party in Interest Public Employers Are Exempt from California Wage and Hour Laws

A. *Public agencies are not exempt from the provisions of wage order No. 15-2001*

The trial court concluded that real parties in interest were exempt from California wage and hour laws, agreeing with real parties in interest that the Labor Code sections cited by Guerrero are inapplicable to public agencies and that California courts have consistently held that public employers are exempt from California wage and hour laws. (See *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 330 [25 Cal.Rptr.3d 320, 106 P.3d 976] (*Campbell*); see also *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1192 [48 Cal.Rptr.3d 108, 141 P.3d 225] (*Wells*).) The trial court further reasoned that IWC wage order No. 15-2001 regarding household occupations did not apply to Guerrero's alleged employment, as it does not refer to public agencies, but expressly applies only to *private* employers. Finally, the trial court also concluded that the wage order specifically exempted personal attendants, such as Guerrero, from its application.

Wage order No. 15-2001 provides in relevant part: "This order *shall apply to all persons employed in household occupations*, whether paid on a time, piece rate, commission, or other basis unless such occupation is performed for an industry covered by an industry Order of this Commission, *except* that: [¶] . . . [¶][27] (B) Except as provided in section[] . . . 4 [('Minimum Wages')], the provisions of this Order *shall not apply to personal attendants.* . . ." (Cal. Code Regs., tit. 8, § 11150, subd. 1(A) & (B), italics added.) In the "Definitions" section, "Household Occupations" is broadly defined to mean "all services related to the care of persons or maintenance of a private household or its premises by an employee of a private householder. Said occupations shall include, but not be limited to, the following: butlers, chauffeurs, companions, cooks, day workers, gardeners, graduate nurses, grooms, house cleaners, housekeepers, maids, practical nurses, tutors, valets, and other similar occupations." (*Id.*, § 11150, subd. 2(I).)

Unlike *Campbell, supra,* 35 Cal.4th 311 and *Wells, supra,* 39 Cal.4th 1164, which did not involve wage and hour claims, the court in *Sheppard, supra,* 191 Cal.App.4th 289, concluded that minimum wage provisions of an IWC wage order applied to an employee of a regional occupational program established by public school districts. In interpreting the wage order before it, *Sheppard*

---

[27] Exceptions for persons employed in administrative, executive, or professional capacities not relevant to this appeal follow. (Cal. Code Regs., tit. 8, § 11150, subd. 1(A).)

reviewed applicable rules of statutory interpretation and quoted extensively from the Supreme Court's opinion in *Wells*:

■ "In *Wells*[, *supra*,] 39 Cal.4th 1164, 1192 . . . , the Supreme Court explained: 'A traditional rule of statutory construction is that, absent express words to the contrary, governmental agencies are not included within the general words of a statute.' (See *Campbell*[, *supra*,] 35 Cal.4th [at p.] 330 . . . [' "Generally, however, provisions of the Labor Code apply only to employees in the private sector unless they are specifically made applicable to public employees." '].) The Supreme Court pointed out an exception to this principle that 'government agencies are excluded from the operation of general statutory provisions "only if their inclusion would result in an infringement upon sovereign governmental powers. . . . Pursuant to this principle, governmental agencies have been held subject to legislation which, by its terms, applies simply to any 'person.' " ' (*Wells*, at p. 1192.) The Supreme Court explained, 'the premise that public entities are statutory "persons" unless their sovereign powers would be infringed is simply a maxim of statutory construction. While the "sovereign powers" principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent.' (*Id.* at p. 1193.)" (*Sheppard, supra*, 191 Cal.App.4th at pp. 299–300.)

■ "In addition, ' "[s]tatutes governing conditions of employment are construed broadly in favor of protecting employees." [Citations.] We construe wage orders, as quasi-legislative regulations, in accordance with the standard rules of statutory interpretation.' (*Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 435 [41 Cal.Rptr.3d 482].)" (*Sheppard, supra*, 191 Cal.App.4th at p. 300.)

Applying these rules of statutory construction to the wage order before it, *Sheppard* reasoned:

IWC wage order No. 4-2001 (applying to "all persons employed in professional, technical, clerical, mechanical, and similar occupations . . . .") stated: "Except as provided in Section[] . . . 4 [('Minimum Wages')] . . . , the provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district." (Cal. Code Regs., tit. 8, § 11040, subd. 1(B); see *Sheppard, supra*, 191 Cal.App.4th at p. 300.) Because wage order No. 4-2001 referred to section 4 (Minimum Wages) as an *express exception* to its general statement that the order did not apply to employees of the state or political subdivisions of the state, the *Sheppard* court interpreted the language of the wage order "by its terms, to impose the minimum wage provision as to all employees in the occupations described therein, including employees directly employed by the state or any political subdivision of the state." (*Sheppard*, at pp. 300–301.)

Our application of a similar analysis to IWC wage order No. 15-2001, Order Regulating Wages, Hours, and Working Conditions in Household Occupations, convinces us the trial court erred in determining as a matter of law that real parties in interest were immune from Guerrero's state wage and hour action.

■ First, all 17 of the IWC's industry, occupational and miscellaneous wage orders, including IWC wage order No. 15-2001, address the applicability of the respective orders in substantially the same language: "This order shall apply to *all persons* employed in [the named] industry" or "to *all persons* employed in [named] occupations . . . ." (See Cal. Code Regs., tit. 8, § 11000 et seq. [generally at subd. 1 of the various wage orders].) Consequently the exception recognized by *Wells, supra*, 39 Cal.4th at page 1192, and by *Sheppard, supra*, 191 Cal.App.4th at pages 299–300—holding public agencies "subject to legislation which, by its terms, applies simply to any 'person' "—applies here. We see no difference between the application of the wage order to "all persons" employed in a particular occupation or industry and "any person" so employed. Therefore, unless the wage order expressly exempts public agency employers from its coverage, they will be covered.

■ Second, *unlike* 14 of the 17 industry, occupation and miscellaneous wage orders (including wage order No. 4-2001 at issue in *Sheppard, supra*, 191 Cal.App.4th 289), wage order No. 15-2001 *does not expressly exempt* public employees from its provisions.[28] The express exemptions of the other 14 industrial and occupational wage orders state: "[T]he provisions of this order shall not apply to any employees directly employed by the State or any political subdivision thereof, including any city, county, or special district."[29] Wage order No. 15-2001 contains no language exempting public agencies or political subdivisions from its coverage. " 'Where a statute referring to one subject contains a critical word or phrase, omission of that word or phrase

---

[28] The other two wage orders that do not exempt political subdivisions are wage orders Nos. 14 ("Agricultural Occupations") (Cal. Code Regs., tit. 8, § 11140) and 17 ("Miscellaneous Employees") (*id.*, § 11170).

[29] Exemptions for political subdivisions are contained in wage orders Nos. 1 ("Manufacturing") (Cal. Code Regs., tit. 8, § 11010, subd. 1(B)); 2 ("Personal Service Industry") (*id.*, § 11020, subd. 1(B)); 3 ("Canning, Freezing and Preserving Industry") (*id.*, § 11030, subd. 1(B)); 4 ("Professional, Technical, Clerical, Mechanical, and Similar Occupations") (*id.*, § 11040, subd. 1(B)); 5 ("Public Housekeeping Industry") (*id.*, § 11050, subd. 1(C)); 6 ("Laundry, Linen Supply, Dry Cleaning and Dyeing Industry") (*id.*, § 11060, subd. 1(B)); 7 ("Mercantile Industry") (*id.*, § 11070, subd. 1(B)); 8 ("Industries Handling Products After Harvest") (*id.*, § 11080, subd. 1(B)); 9 ("Transportation Industry") (*id.*, § 11090, subd. 1(B)); 10 ("Amusement and Recreation Industry") (*id.*, § 11100, subd. 1(C)); 11 ("Broadcasting Industry") (*id.*, § 11110, subd. 1(B)); 12 ("Motion Picture Industry") (*id.*, § 11120, subd. 1(B)); 13 ("Industries Preparing Agricultural Products for Market, on the Farm") (*id.*, § 11130, subd. 1(B)); and 16 ("Certain On-Site Occupations in the Construction, Drilling, Logging, and Mining Industries") (*id.*, § 11160, subd. 1(B).)

from a similar statute on the same subject generally shows a different legislative intent.' [Citation.]" (*In re Young* (2004) 32 Cal.4th 900, 907 [12 Cal.Rptr.3d 48, 87 P.3d 797]; see *Douda v. California Coastal Com.* (2008) 159 Cal.App.4th 1181, 1193–1194 [72 Cal.Rptr.3d 98]; *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 896 [80 Cal.Rptr.3d 690, 188 P.3d 629].) "Generally, the same rules of construction and interpretation which apply to statutes govern the construction and interpretation of rules and regulations of administrative agencies." (*Cal. Drive-in Restaurant Assn. v. Clark* (1943) 22 Cal.2d 287, 292 [140 P.2d 657].) We conclude the plain language of wage order No. 15-2001, when compared with that of the other industrial and occupation wage orders, demonstrates the IWC did not intend to exempt public agencies or political subdivisions generally from its provisions applicable to household occupations.

### B. *Private household employee*

Nor are we persuaded by the trial court's reasoning that wage order No. 15-2001 does not apply to public agencies and political subdivisions because it expressly discusses only private household employment. Such analysis misconstrues the wage order by ignoring the joint employer doctrine and assuming a provider cannot render services to a private householder as the employee of both the householder and the public agency for purposes of the wage and hour law. Providers of IHSS services generally provide "services related to the care of persons or maintenance of a private household or its premises [as] an employee of a private householder." (Wage order No. 15-2001, subd. 2(I).) That Buenrostro, the private householder, was an employer of Guerrero for purposes of the wage order does not in any way preclude a determination that real parties in interest were joint employers with Buenrostro. (See *Bonnette, supra,* 704 F.2d at p. 1469; see also *In-Home Supportive Services v. WCAB, supra,* 152 Cal.App.3d 720.) In *In-Home Supportive Services v. WCAB,* the court held the IHSS provider was a *dual employee* of the IHSS recipient and the state. (*Id.* at p. 732.) In so holding, the court rejected the state's argument that the recipient and the state could *not* be joint employers where language in Labor Code section 3351.5, subdivision (b), stated that an IHSS worker is " '*an* employee of the recipient.' " (*In-Home Supportive Services,* at pp. 733–734.) Similarly, that Guerrero rendered services as "an employee" of householder Buenrostro, does not preclude her from being a dual employee of Buenrostro and real parties in interest.

### C. *Personal attendant exemption*

Nor are we persuaded that the court properly determined as a matter of law on demurrer that Guerrero was excepted from the coverage of wage order

No. 15-2001 as a "personal attendant." (Cal. Code Regs., tit. 8, § 11150, subd. 1(B).) Whether Guerrero rendered services to Buenrostro as a personal attendant was a question of fact, particularly in the absence of any description of the specific IHSS services Buenrostro was authorized to receive and that Guerrero provided. (See generally *Cash v. Winn* (2012) 205 Cal.App.4th 1285 [140 Cal.Rptr.3d 867].)

Wage order No. 15-2001 defines "personal attendant" as follows: " 'Personal attendant' includes baby sitters and means any person employed by a private householder or by any third party employer recognized in the health care industry to work in a private household, to supervise, feed, or dress a child or person who by reason of advanced age, physical disability, or mental deficiency needs supervision. *The status of 'personal attendant' shall apply when no significant amount of work other than the foregoing is required.*" (Cal. Code Regs., tit. 8, § 11150, subd. 2(J), italics added). The trial court ignored the language we have italicized.

As we observed with respect to application of the "companionship exemption" of the FLSA, "Determining whether or not all of the elements of the exemption have been established is a *fact-intensive inquiry.* The appropriateness of any employee's classification as exempt must be based on a review of the actual job duties performed by that employee." (*United Parcel Service Wage & Hour Cases, supra*, 190 Cal.App.4th at pp. 1014–1015, italics added.) So, too, determination of the nature of services performed by Guerrero under the IHSS program and whether they placed her within the definition of a "personal attendant" requires a factual inquiry. The court erred in making that determination as a matter of law here.

Were the court to have correctly determined that Guerrero provided services that would bring her within the definition of a "personal attendant," Guerrero's allegation that more than 20 percent of the time she performed "general household work" for Buenrostro raised an issue of fact as to her personal attendant status as under the wage order: "The status of 'personal attendant' shall apply when no significant amount of work other than the foregoing is required." (Cal. Code Regs., tit. 8, § 11150, subd. 2(J).)

A formal opinion letter issued by the DLSE states that in determining what is "significant," the DLSE historically has adopted the federal companionship services standard of not to exceed 20 percent of total weekly hours worked. Thus, a "significant amount" of work under the state regulation is that exceeding 20 percent of the total hours worked. (Dept. of Industrial Relations, DLSE Opn. Letter No. 2005.11.23, *supra*, at p. 2, fn. 3 <www.dir.ca.gov/dlse/opinions/2005-11-23.pdf> [as of Feb. 11, 2013]; *Cash v. Winn, supra*, 205 Cal.App.4th 1298–1299 [20 percent rule is a reasonable

interpretation of the wage order].) Although not a regulation, this opinion letter, issued by the State Labor Commissioner and Chief of the DLSE may be persuasive in this similar case. (See *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296]; see also *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 [78 Cal.Rptr.2d 1, 960 P.2d 1031] ["Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is thus fundamentally *situational*."]; *Cash v. Winn, supra,* 205 Cal.App.4th at pp. 1301–1303.)

■ Finally, we observe that even if undisputed material facts demonstrated as a matter of law (which they do not) that Guerrero came within the "personal attendant" exemption of wage order No. 15-2001, she would still be entitled to minimum wages under California law for IHSS program services she performed for Buenrostro. Wage order No. 15-2001 states: *"Except as provided in section*[] . . . *4* [(*Minimum Wages*)] . . . , the provisions of this Order shall not apply to personal attendants. . . ." (Cal. Code Regs., tit. 8, § 11150, subd. 1(B), italics added.) Section 4 of wage order No. 15-2001 requires "[e]very employer" to pay to each employee wages not less than the minimum wage for all hours worked. (Cal. Code Regs., tit. 8, § 11150, subd. 4.) Consequently, the exemption of personal attendants from *some* protections of the wage order does not extend to the *minimum wage protections* provided in section 4. It is an "express exception" to the exemption. (See *Sheppard, supra,* 191 Cal.App.4th at pp. 300–301; see also Dept. of Industrial Relations, DLSE Opn. Letter No. 2005.11.23, *supra,* at p. 2.)[30] Just as in *Sheppard,* the minimum wage exception to the exemption (in this case the exception for personal attendants, rather than for employees of political agencies and subdivisions at issue in *Sheppard*) rendered the

---

[30] Since 2001, "[a] determination *that an individual is a personal attendant has the effect of exempting that person from the protections of the IWC Order, except for minimum wage.* Accordingly, we must continue to stress, as has been emphasized in every prior DLSE communication on this topic, that *such a determination is fact intensive and must be narrowly construed on a case-by-case basis.* [¶] We cannot provide you with a comprehensive list of acceptable duties for a personal attendant. However it is instructional, and not inconsistent with the long standing DLSE position, to consider those duties included by the U.S. Department of Health and Human Services National Center for Health Statistics' definitions for activities of daily living. Such activities relate to personal care and include, but are not limited to, such duties as bathing, showering, getting in or out of a bed or chair and using a toilet. 'Supervising' may also include assistance in obtaining medical care, preparing meals, managing money, shopping for groceries or personal items, using a telephone or performing housework when such activities are related to the independent living of the person and cannot be performed by him or herself alone due to a health or age limitation. It must be noted, however, that any general housekeeping duties performed should not exceed 20% of the weekly working time spent by the personal attendant to maintain his or her exemption under IWC Wage Order 15." (Dept. of Industrial Relations, DLSE Opn. Letter No. 2005.11.23, *supra,* at pp. 2–3, fn. omitted, italics added.)

personal attendant exemption inapplicable to the minimum wage protections of wage order No. 15-2001, section 4.

In sum, the trial court erred in sustaining the demurrer to Guerrero's causes of action for violation of the California wage and hour laws.

## CONCLUSION

We conclude the trial court erred in sustaining the demurrer to Guerrero's causes of action for violation of the FLSA and California wage and hour laws.

## DISPOSITION

THEREFORE, let a peremptory writ issue, (1) commanding respondent superior court to vacate its order of July 18, 2011, sustaining the demurrer of real parties in interest without leave to amend as to Guerrero's causes of action for unpaid wages and overtime and (2) vacating the judgment entered in favor of real parties. In addition, the court is to issue a new and different order overruling the demurrer.

Lambden, J., and Richman, J., concurred.

A petition for a rehearing was denied March 11, 2013, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied June 12, 2013, S210134.